## ALTON RAILROAD CO. ET AL. *v.* UNITED STATES ET AL.[*]

No. 110.  Argued December 19, 22, 1941.—Decided January 12, 1942.

[*]Together with No. 267, *United States et al.* v. *Alton Railroad Co. et al.,* also on appeal from the District Court of the United States for the Eastern District of Michigan.

*Mr. Amos M. Mathews,* with whom *Messrs. Henry P. Stacy, Frederick V. Slocum, Joseph H. Hays,* and *Richard W. Sharpless* were on the brief, for the Alton Railroad Co. et al.

*Mr. Daniel W. Knowlton,* with whom *Solicitor General Fahy, Assistant Attorney General Arnold,* and *Messrs. Frank Coleman, Nelson Thomas,* and *John C. Lehr* were on the brief, for the United States et al. *Mr. George S. Dixon,* with whom *Messrs. Carney D. Matheson* and *Edmund M. Brady* were on the brief, for John P. Fleming.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

These cases are an appeal and a cross appeal under § 210 (28 U. S. C. § 47a) and § 238 of the Judicial Code

as amended (28 U. S. C. § 345) to review a final decree of a district court of three judges (28 U. S. C. § 47) which modified in part and sustained as modified (36 F. Supp. 898) an order of the Interstate Commerce Commission (8 M. C. C. 469) granting appellee Fleming a certificate of public convenience and necessity as a common carrier by motor vehicle under the so-called "grandfather clause" (§ 206 (a)) of the Motor Carrier Act of 1935.[1]   49 Stat. 543, 551, 49 U. S. C. § 306.

The findings of the Commission may be briefly summarized as follows: Fleming, on and since June 1, 1935, was engaged in *bona fide* operation as a common carrier by motor vehicle "in driveaway service of new automotive vehicles, finished and unfinished, and  new automotive vehicle chassis."  This driveaway or caravaning method of transportation is performed by individual driving of the vehicle under its own power, by driving one vehicle under its own power and towing a second vehicle attached to the first, or by driving under its own power a vehicle upon which another vehicle is partially or wholly mounted. Shipments by Fleming originated from the factories of automobile manufacturers in Detroit, Michigan, and were made to dealers and distributors in various States.   Certain new cars were returned to Detroit in the same manner.  Fleming commenced operations in 1933, and between January 1, 1934 and June 1, 1935 transported shipments to one point each in Arkansas and Alabama; to two points each in California, New York, Pennsylvania and Tennessee; to three points each in Washington, Oregon, Kentucky and North Carolina; to four points in Texas; to five points in South Carolina; and to seven points in Georgia.  About 1200 vehicles were transported in this period and more than 2100 from 1933 to July,

---

[1] The Motor Carrier Act of 1935 is now designated as Part II of the Interstate Commerce Act.   54 Stat. 919.

1936, the time of the hearing. Shipments consisted of from one to sixteen vehicles, shipments of two and four being the most common. Fleming's service was confined to deliveries at very few points in several States, due to the fact that he was furnishing a highly specialized transportation service from manufacturers to dealers and distributors. Shipments to most of the States named were numerous. Shipments to other States were fewer in number. Thus the three shipments to Arkansas aggregated twenty-five vehicles, the four shipments each to Texas and Oregon aggregated fourteen vehicles and twenty-four vehicles respectively, and the five shipments to Washington aggregated twenty-eight vehicles. Operations in those four States started just prior to June 1, 1935; but they were sufficient in scope to establish that Fleming was in *bona fide* operation in them on the statutory date. Fleming held his services out to the public generally as a common carrier and operated as such; and he held himself out to transport by the driveaway method between any points in the States for which application was made.

Though his transportation of shipments was restricted to a few points in each of the enumerated States, the Commission held that he was entitled to transport to all points in all of the States served, with the exception of New York and Pennsylvania, as respects which the application was denied. The District Court sustained the order of the Commission in all respects except the operation in Arkansas. As to that it held that his service had been abandoned.

We are met at the outset with the question of the standing of the appellant railroad companies (seventy-one in number) to bring and maintain the suit in the District Court. All but a few intervened in the hearing before the Commission. Each is a common carrier and a competitor of Fleming in some portion of the territory which

Fleming is authorized to serve. They rest their right to sue on § 205 (h) of the Motor Carrier Act[2] (49 U. S. C. Supp. § 305 (h)) which provides that "Any final order made under this part shall be subject to the same right of relief in court by any party in interest as is now provided in respect to orders of the Commission made under part I . . ." Sec. 1 (20) of Part I (49 U. S. C. § 1 (20)) authorizes "any party in interest" to sue to enjoin any construction, operation or abandonment of a railroad made contrary to § 1 (18) or (19). Such suits may be maintained not only where the railroad proceeds without authorization of the Commission but also where it proceeds under a certificate of the Commission whose validity is challenged. *Claiborne-Annapolis Ferry Co.* v. *United States,* 285 U. S. 382. Hence we conclude that § 205 (h) has incorporated by reference the "party in interest" provision of § 1 (20). We do not stop to inquire what effect, if any, the status of appellant railroad companies as intervenors before the Commission had on their right to bring and maintain this suit. Cf. *Chicago Junction Case,* 264 U. S. 258, with *Pittsburgh & West Virginia Ry. Co.* v. *United States,* 281 U. S. 479. They clearly have a stake as carriers in the transportation situation which the order of the Commission affected. They are competitors of Fleming for automobile traffic in territory served by him. They are transportation agencies directly affected by competition with the motor transport industry—competition which prior to the Motor Carrier Act of 1935 had proved destructive. S. Doc. No. 152, 73d Cong., 2d Sess., pp. 13–27. They are members of the national transportation system which that Act was designed to coördinate. S. Rep. No. 482, 74th Cong., 1st Sess.; H. Rep. No. 1645, 74th Cong., 1st Sess. Hence they are parties in interest within

---

[2] Now § 205 (g) of Part II of the Interstate Commerce Act. 54 Stat. 922; 49 U. S. C. § 305 (g).

the meaning of § 205 (h) under the tests announced in *Texas & Pacific Ry. Co.* v. *Gulf, C. & S. F. Ry. Co.,* 270 U. S. 266; *Western Pacific California R. Co.* v. *Southern Pacific Co.,* 284 U. S. 47; and *Claiborne-Annapolis Ferry Co.* v. *United States, supra.*

The appellant railroad companies earnestly contend that the Commission was without authority to authorize Fleming to serve a whole State where, as here, his services had been in fact limited to only a few points in the State. The argument is that any rights obtained under the "grandfather clause" should be delimited to the actual area in which the applicant was in *bona fide* operation during the period in question. Sec. 206 (a) provides for the issuance of a certificate of public convenience and necessity without proof beyond the fact that the applicant or his predecessor in interest "was in bona fide operation as a common carrier by motor vehicle on June 1, 1935, over the route or routes or within the territory for which application is made and has so operated since that time." Sec. 208 (a) provides that such certificate "shall specify the service to be rendered and the routes over which, the fixed termini, if any, between which, and the intermediate and off-route points, if any, at which, and in case of operations not over specified routes or between fixed termini, the territory within which, the motor carrier is authorized to operate." The authority granted Fleming was to operate in the designated territory "over irregular routes" through specified States. It is plain from the statute that operations need not be restricted to specified routes or between fixed termini. But the question remains as to the power of the Commission to authorize operation in an entire State where only a few points in that State had been served.

"Territory" is not a word of art. The characteristics of the transportation service involved as well as the geographical area serviced are relevant to the territorial

scope of the operations which may be authorized under the "grandfather clause." While the test of "bona fide operation" within a specified "territory" includes "actual rather than potential or simulated service" (*McDonald v. Thompson*, 305 U. S. 263, 266), it does not necessarily restrict future operations to the precise points or areas already served. The characteristics of the transportation service rendered may of necessity have made trips to any specified locality irregular or sporadic. And they may likewise have restricted prior operations to but a few points in a wide area which the carrier held itself out as being willing and able to serve. The Commission has taken the characteristics of various transportation services into consideration in determining the scope of the territory covered by certificates under the "grandfather clause." Thus, operations on irregular routes within a wide territory have been authorized in case of common carriers of household goods. Bruce Transfer & Storage Co., 2 M. C. C. 150; William J. Wruck, 12 M. C. C. 150. Similar broad authority has been granted common carriers of oil-field equipment and supplies. Charles B. Greer, Jr., 3 M. C. C. 483; Union City Transfer, 7 M. C. C. 717; L. C. Jones Trucking Co., 9 M. C. C. 740. And a like result has been reached in case of automobile transporters such as the applicant in the instant case. George Cassens & Sons, 1 M. C. C. 771. And see Charles E. Danbury, 17 M. C. C. 243. The general theory underlying the household goods cases was expressed in W. J. Wruck, *supra*, pp. 151–152, as follows:

"Calls for service between the same points are seldom repeated. Traffic is not regular in any given direction. What may be infrequent but fairly regular business to or from a certain State for a small carrier may be only sporadic business for a large carrier; consequently, a frequency of service that might amount to 'grandfather' clause rights in the case of the former could conceivably

22

be inadequate in the case of the latter. It would be an impractical solution to carve out oddly shaped areas for service based solely on the frequency of service; consideration must also be given to the general territory served under the holding-out, even if the business in some States may not equal that in other States in the territory."

The Commission took a somewhat similar approach to the problem presented in the instant case. It noted that Fleming was restricted to shipments at points where the manufacturers had established distribution facilities; that those facilities were limited in any given area; that Fleming's opportunity for service was therefore confined to a very few distribution points and his operations were irregular; that less than an estimated seven per cent of all new automobiles sold during 1935 in twenty-four western States were transported by the driveaway method; that distribution points in the automobile industry are constantly shifted; that allowance must be made for frequent changes in points served by a carrier who depends for his traffic entirely upon this one industry; and that Fleming's future opportunity for obtaining traffic will doubtless be as limited as in the past. In view of the scope of his holding out and the nature and characteristics of the highly specialized transportation service rendered, the Commission authorized continuance of his service to all points in the enumerated States. That is a judgment which we should respect. Certainly we cannot say that it was a wholly inappropriate method for creating that substantial parity between future operations and prior *bona fide* operations which the statute contemplates. The special characteristics of this roving transportation service make tenable the conclusion that Fleming's prior limited opportunity for service could not be preserved unless statewide areas, within the scope of his holding out and partially covered by his previous operations, were kept open

for him. That judgment is for the administrative experts, not the courts.

Appellant railroad companies also urge that Fleming should not have been awarded any rights under the "grandfather clause" in Washington, Oregon, and California. Before June 1, 1935, Fleming had made five deliveries to three different points in Washington, four deliveries to three different points in Oregon, and at least two deliveries to two different points in California. After June 1, 1935, and prior to the hearing in July 1936, two deliveries were made in Washington, two in Oregon, and apparently several in California. These shipments did not appear to be merely nominal.[3] Thus there was evidence that on and since June 1, 1935, Fleming had been in *bona fide* operation in those States. The weighing of such evidence involves in part a judgment based on the characteristics of the highly specialized transportation service involved. Thus, as we have said, that function is peculiarly one for the Commission, not the courts.

Appellant railroad companies also insist that Fleming was not in "bona fide operation" in Oregon because in January, 1936 he obtained in that State a contract carrier permit. The argument is that he could not obtain under the "grandfather clause" common carrier rights in Oregon in the face of his contract carrier status there. Cf. *United States* v. *Maher*, 307 U. S. 148. They further urge that Fleming's operations in Nebraska (one of the States through which his irregular routes were authorized) were conducted in violation of state law. In that connection, reliance is placed on his testimony that in

---

[3] As to California the evidence was less specific than in the other States. Shipping bills showed three deliveries to California aggregating five vehicles, the latest being in December, 1935. In addition, there was testimony that shortly prior to the hearing in 1936 deliveries of taxicabs and trucks had been made in that State.

Nebraska he claimed to be the owner of the vehicles in order to reduce license fees. The expression "in bona fide operation" plainly "does not extend to one operating as a common carrier on public highways of a State in defiance of its laws." *McDonald* v. *Thompson, supra,* p. 266. Congress has not, however, conditioned rights under the "grandfather clause" on compliance with state laws. Their violation is material only insofar as it may be relevant to establishing an absence of "bona fide operation." Infractions of state law, however, may be innocent or wilful, minor or considerable. They may or may not concern the right to operate in the State. Furthermore, the status of a carrier under state law may or may not be identical with his status as a common or contract carrier under the Motor Carrier Act. The question whether his operation in a particular State was "bona fide" is a question of fact for the Commission to determine. Such operation might well be in good faith though state laws were infracted. And the fact that an applicant may have to make his peace with state authorities does not necessarily mean that his rights under the "grandfather clause" should be denied or withheld. See Earl W. Slagle, 2 M. C. C. 127. Occasional noncompliance with state laws does not *per se* establish a course of conduct which is preponderantly one of evasion. Certainly no such course of conduct can be fairly implied in this case. Our task is ended if there is evidence to support the Commission's finding of *bona fides.* There is such evidence here.

It is urged on the cross appeal that the court below should not have set aside the Commission's inclusion of Arkansas in the certificate. The evidence was that Fleming had served only one locality in Arkansas—the city of Texarkana. He had made three shipments there aggregating twenty-five vehicles. All of those shipments had been made prior to June 1, 1935, the latest being May 12,

1935. Though fourteen months expired between that date and the date of the hearing, there was no evidence that any shipments were made to any locality in Arkansas since June 1, 1935. No explanation of that long hiatus was proffered. But § 206 (a) requires a finding of "bona fide operation . . . within the territory" not only "on June 1, 1935" but also "since that time." We cannot say that an unexplained failure to make any shipments to Arkansas for over a year "since that time" satisfies the statutory command, even though the nature of the highly specialized transportation service involved be given the greatest weight. Cf. *United States* v. *Maher, supra.* A mere holding out will not alone suffice to bridge the long gap extending through and beyond one entire automobile production year, since applicant carries the burden of establishing his right to the statutory grant.

We have considered the other points raised by appellant railroad companies and find them without substance.

*Affirmed.*

MR. JUSTICE ROBERTS did not participate in the consideration or decision of this case.