### PENINSULA CORPORATION OF SEAFORD, DEL., v. UNITED STATES et al.

No. 24102.

District Court of the United States for the District of Columbia.

Jan. 31, 1945.

---

176

J. E. Hummer, C. V. Guthrie, and E. B. Ussery, all of Washington, D. C., for plaintiffs.

E. M. Reidy, Asst. Chief Counsel, of Washington, D. C., for Interstate Commerce Commission.

Robert L. Pierce, Department of Justice, Wendell Berge, Department of Justice, and Edward M. Curran, U. S. Dist. Atty., all of Washington, D. C., for the United States.

John R. Norris and James J. Doherty, both of Baltimore, Md., and Eugene X. Murphy, of Washington, D. C., for intervenor Interstate Common Carrier Council of Maryland, Inc.

Before EDGERTON, Associate Justice of the United States Court of Appeals for the District of Columbia, and LETTS and McGUIRE, Associate Justices.

McGUIRE, Associate Justice.

This is a suit under 28 U.S.C.A. §§ 41 (28), 43–47a, to set aside an order of the Interstate Commerce Commission entered November 11, 1943.

The report and order of Division 5 of the Commission (Exhibit B to the complaint) dismissed plaintiff's application under the "grandfather" clause of Section 206 (a) of the Interstate Commerce Act.[1] This application, as amended,[2] sought a certificate of public convenience and necessity to continue operations as a common carrier by motor vehicle in interstate commerce of commodities to and from certain designated points over irregular routes.[3]

[1] 49 U.S.C.A. § 306(a). This section, after forbidding operation in interstate or foreign commerce by common carriers by motor vehicle without a certificate of public convenience and necessity from the Commission authorizing such operations, contains the following proviso known as the "grandfather" clause:

"*Provided, however,* That * * * if any such carrier or predecessor in interest was in bona fide operation as a common carrier by motor vehicle on June 1, 1935, over the route or routes or within the territory for which application is made and has so operated since that time, or if engaged in furnishing seasonal service only, was in bona fide operation on June 1, 1935, during the season ordinarily covered by its operation and has so operated since that time, except in either instance as to interruptions of service over which the applicant or its predecessor in interest had no control, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate was made to the Commission as provided in paragraph (b) of this section and within one hundred and twenty days

after October 1, 1935, and if such carrier was registered on June 1, 1935, under any code of fair competition requiring registration, the fact of registration shall be evidence of bona fide operation to be considered in connection with the issuance of such certificate."

[2] By plaintiff's president, Truitt, at the hearing on October 11, 1939. (Tr. 51–54).

[3] *Farm produce,* from points in Florida, points in Bibb and Tifton Counties, Ga., and points in Barnwell County, S. C., to New York, N. Y., Baltimore, Md., Philadelphia, Pa., Seaford, Del., and Washington, D. C., and from points in Western New York State to Allentown, Altoona, Bradford, Johnstown, Philadelphia, Pittsburgh, and Uniontown, Pa., Bridgeport, Hartford, and New Haven, Conn., Boston, Mass., Providence, R. I., Newark, N. J., Baltimore, Md., and Washington, D. C.

*Canned goods,* from points in the Del-Mar-Va Peninsula to points in North Carolina, South Carolina, and Georgia, and to Norfolk, Richmond and Suffolk, Va.

*Shingles, lumber, and insulating boards,* from Philadelphia, Pa., and Wilmington, Del., to points in Delaware and eastern shore of Maryland.

*Lubricating oils and greases, in contain-*

In view of the character of the attack made by plaintiff on the conduct of the proceedings before the Commission, a rather lengthy résumé of the proceedings both before and after the order in question as gleaned from the record before this court is set forth and in some detail.

On February 4, 1936, one John R. Mitchell (plaintiff's predecessor) filed an application with the Commission under the "grandfather clause" of the Interstate Commerce Act—supra,[1] requesting authority to operate as a common carrier by motor vehicle of commodities generally throughout Maryland, Virginia, North Carolina, Delaware, Pennsylvania, New Jersey and New York. The application was filed on the short emergency form, which specified that the applicant must, on or before a date to be designated by the Commission, furnish evidence to support all allegations.

On March 8, 1937, Mitchell filed a statement of facts in support of his application in which he said that the main volume of his traffic was obtained in Florida, North Carolina, and Del-Mar-Va Peninsula, and was transported to Northern and Eastern markets. Seventy-five percent of the revenue was claimed to be derived from hauling farm products, the remainder from general commodities. At the same time Mitchell filed statements by two shippers to the effect that he had carried shipments for them to and from Florida, and he also filed a certificate of registration under the N.R.A. which recited that he operated in North Carolina, Virginia, Maryland, Delaware, Pennsylvania, New Jersey and New York. In this statement Mitchell indicated that, in addition to the seven states just named, he operated in Florida, Georgia, South Carolina, the District of Columbia, Connecticut, Rhode Island and Massachusetts.

On April 5, 1937, the application was transferred to Mitchell's successor, Mitchell and Furniss, d/b/a Sussex Motor Line, a partnership.

On December 8, 1937, at the direction of the Commission, Mitchell appeared before a District Supervisor to submit proof of his operations. He submitted an affidavit in which he enumerated seventeen classes of commodities which he handled and specified the points of origin and destination. It is alleged by the plaintiff that Mitchell exhibited to the Supervisor certain documents, books and papers, in support of his operations, and this allegation is apparently

ers, from Marcus Hook, Pa., to Seaford, Del.

*Fertilizer*, from Laurel, Del., and Salisbury, Md., to points and places in Wicomico, Dorchester, Caroline, Talbot, Queen Anne and Worcester Counties, Maryland, and Accomac and Northampton Counties, Virginia; and from Salisbury, Md., and Laurel, Del., to points and places in Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, and Salem Counties, New Jersey.

*Lime*, from Philadelphia, Plymouth, Meeting, Paoli, and West Chester, Pa., and Wilmington, Del., to points and places in Kent and Sussex Counties, Del., and Wicomico, Dorchester, Worcester and Somerset Counties, Md.

*Livestock feed*, from Baltimore, Md., Wilmington, Del., and Philadelphia, Pa., to points and places in Sussex County, Del., and Wicomico County, Md.

*Coal*, from Franklinville, Minersville, Pottsville, and Scranton, Pa., to points and places in Sussex County, Del., and Wicomico County, Md.

*Sugar and wholesale groceries*, from Philadelphia, Pa., to Georgetown and Laurel. Del.

[1] 49 U.S.C.A. § 306(a). This section, after forbidding operation in interstate or foreign commerce by common carriers by motor vehicle without a certificate of public convenience and necessity from the Commission authorizing such operations, contains the following proviso known as the "grandfather" clause:

"*Provided, however,* That * * * if any such carrier or predecessor in interest was in bona fide operation as a common carrier by motor vehicle on June 1, 1935, over the route or routes or within the territory for which application is made and has so operated since that time, or if engaged in furnishing seasonal service only, was in bona fide operation on June 1, 1935, during the season ordinarily covered by its operation and has so operated since that time, except in either instance as to interruptions of service over which the applicant or its predecessor in interest had no control, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate was made to the Commission as provided in paragraph (b) of this section and within one hundred and twenty days after October 1, 1935, and if such carrier was registered on June 1, 1935, under any code of fair competition requiring registration, the fact of registration shall be evidence of bona fide operation to be considered in connection with the issuance of such certificate."

admitted by the Commission; there is, however, no reference to this evidence in the papers forwarded by the Supervisor to the Commission. Mitchell also submitted affidavits of ten shippers to the effect that he had hauled commodities for them; only one of those is specific as to dates, commodities transported, origin and destination. The District Supervisor forwarded to the Commission these eleven affidavits together with a short questionnaire, but it nowhere appears in the record what, if any, recommendation the Supervisor made.

On February 12, 1938, the Commission entered an order authorizing the applicant to transport the seventeen classes of commodities enumerated in Mitchell's affidavit and designating practically the same points of origin and destination as had been specified in Mitchell's affidavit.

On March 15, 1938, the rail carriers in the Official Classification Territory filed a petition with the Commission to stay issuance of the certificate upon the ground that there was not adequate proof to support the order as issued; it was requested further that the applicant be required to furnish documentary proof or specific affidavits indicating the nature of his operations. This petition was denied by Division 5 of the Commission on May 12, 1938.

On October 28, 1938, the rail carriers filed another petition asking reconsideration and reopening of the applicant's case on the ground that proper proof had not been submitted to support such a broad authorization. It was further alleged that the original application, which mentioned only the seven states from North Carolina to New York, had never been amended. On May 19, 1939, the rail carriers were notified that the Commission deemed their objections sufficient to refer the case back to the field for further investigation.

Accordingly the case was referred back to the District Supervisor with instructions to hold a conference with the rail carriers. After holding this conference the Supervisor notified the applicant that in the opinion of the protestants the evidence submitted was not sufficient to substantiate the scope of operations granted in the original order.

The Supervisor requested that the applicant appear in his office on June 8, 1939, for an informal conference with the protesting rail carriers, bringing with him such additional proof as he had and specific affidavits of shippers. The applicant refused to appear and requested a formal hearing. On July 24, 1939, the Commission vacated the original order.

On August 22, 1939, the application of Mitchell and Furniss was transferred to the Peninsula Corporation.

On September 13, 1939, the Commission set the case for a formal hearing to be held before Examiner Kephart at Salisbury, Maryland, on October 11, 1939. On September 30, 1939, the rail carriers filed a formal protest against allowance of the application.

At the hearing the rail carriers appeared by counsel. The Peninsula Corporation appeared by its President, Harry I. Truitt, and Mitchell and Truitt testified in its behalf. From the evidence it appeared that the corporation had been formed by Truitt and several small independent carriers for the purpose of avoiding regulation under the Interstate Commerce Act; (Tr. 30), the carriers retained title to their own trucks (Tr.31) and, when hauling exempt commodities, did so as individuals; when non-exempt commodities were to be hauled the trucks were leased to the corporation which then provided the required services (Tr. 31-32-33). The intent plainly was to avoid the provision of the act by which a carrier who hauls both exempt and non-exempt commodities is regulated in all respects. Mitchell testified as to his operations prior to June 1935 (Tr. 13). He was operating as a common carrier over irregular routes (Tr.13). His chief loads were agricultural products and he made a practice of following the produce season (Tr.13-14). He hauled produce from Florida to points along the Atlantic Seaboard as far up as Massachusetts and also to Western Pennsylvania and New York (Tr.13-15-19). On return trips he hauled canned goods and frozen fruit from the Del-Mar-Va Peninsula and from the Western shore of Maryland to Florida and other Southern states. He hauled produce from Georgia, North and South Carolina, Virginia and the Del-Mar-Va Peninsula to the same Northern markets and also hauled from Western New York to the coast. In addition to produce he hauled fertilizer, building materials and wholesale groceries (Tr.21-25). Mitchell, however, could offer no documentary proof. He claimed that the papers which he submitted to the District Supervisor on December 8, 1937, had been destroyed when his house burned down in

1938 (Tr.25). He relied entirely upon his own testimony and the affidavits of shippers which he submitted on December 8, 1937—he had not asked any of these shippers to testify at this hearing (Tr.27). The rail carriers objected to the admission of any of these affidavits unless the shippers were brought to the hearing for cross-examination (Tr.48) and the examiner rejected them.[4] Truitt complained that it was practically impossible to get shippers to appear at a hearing, but proceedings were adjourned for a week to enable him to try to get more evidence (Tr.57). Before the hearing concluded Truitt amended the application as above indicated.[4a]

On October 17, 1939, Truitt appeared at the hearing with only one witness whose knowledge of Mitchell's operations did not prove very substantial. He said he had been so busy that he could not get any of the shipping documents. (Tr.60–69).

Before he could act on the case Examiner Kephart went into the army and the proceedings were turned over to Examiner Sullivan.

On December 11, 1940, the Examiner filed a report and a proposed order. His recommendations as to farm produce covered practically the same territory as had been allowed the applicant in the original order. He was also allowed practically what he had asked for in hauling fertilizer, lubricating oil, livestock feed, coal and lime. He was allowed to transport canned goods from Baltimore and Aberdeen on the Western shore of Maryland, to the Del-Mar-Va Peninsula and points in Virginia, North and South Carolina and Georgia.

On January 15, 1941, the Peninsula Corporation, through an attorney, filed exceptions to the Examiner's report. The chief objection raised was that the Examiner had allowed transportation of canned goods from Baltimore and Aberdeen *to* the Del-Mar-Va Peninsula, although the body of his report made it clear that Mitchell carried such goods from Baltimore, Aberdeen *and* the Del-Mar-Va Peninsula to other points. It was contended that this must have been a clerical error in preparing the report. Examiner Sullivan's report said that Examiner Kephart had excluded the ten affidavits, which Mitchell had attached to his original application, from consideration in the formal hearing on objection by the rail carriers. It was objected that Examiner Kephart had not ruled on the objection of the rail carriers. A further hearing was requested, if the Commission felt that the facts had not been sufficiently proved.

The Commission reopened the case, and on June 1, 1942, ordered a further hearing at Salisbury, Maryland, on July 25, before Examiner Price. On July 8, Mr. Truitt requested a postponement of 90 days and a transfer of the hearing to Washington; he stated that most of his witnesses were in the army, defense plants, or engaged in hauling produce at that time. On July 11, the Commission refused this request.

At the hearing on July 25, Mr. Truitt complained that the Commission had not given him sufficient time to prepare, and that it should have held the hearing in Washington where his attorney was. He presented no new witnesses and no more evidence. The hearing developed into an argument between the Examiner and Truitt.

On January 12, 1943, Examiner Price filed his report and proposed order. He found that the Peninsula Corporation was formed simply to circumvent the Interstate Commerce Act and that no rights should be awarded to it, but should go instead to its predecessor, Mitchell and Furniss. His recommendation as to operations to be allowed were considerably less than those of Examiner Sullivan.

On January 30, 1943, the Commission stayed the effectiveness of the recommended order pending further consideration. On February 3, 1943, Truitt filed exceptions to the recommended order. These exceptions had been prepared by himself and for the most part relate to alleged misstatements of fact in the Examiner's report. The Commission refused to accept these exceptions since the final date for filing was February 1, 1943.

On November 11, 1943, the Commission entered an order denying the application in its entirety on the ground that the applicant had failed to present proper proof.

On January 20, 1944, the applicant filed a motion for reconsideration. It was contended that it was not allowed sufficient

---

[4] The Examiner made no formal order at the hearing rejecting the affidavits, since they were never actually offered, but in his recommended report of December 11, 1940 he did find that such testimony should be excluded.

[4a] See notes 2 and 3, supra.

time to prove its case and to file exceptions. The motion was denied on April 17, 1944.

Before this court the plaintiff urges in support of its petition:

(1) That the Commission was "unduly influenced by the Official Classification Territory Lines Motor Carrier Committee in performing its administrative functions under the laws to the prejudice of the plaintiff * * * and * * * "erred in refusing to grant the plaintiff herein a postponement of the said hearing of July 25, 1942; that the plaintiff was denied a reasonable time in which to secure witnesses and prepare evidence to be presented * * * at said hearing and that the Commission erred in denying the plaintiff a full and fair hearing."

(2) That there was error in the decision and order, that the same was contrary to the evidence, in disregard of material evidence of record, and that the decision and order were arbitrary, capricious and unreasonable.

We find no merit in these contentions.

■ We find nothing in the record, nor was anything elicited at the hearing before us other than mere assertion, to support either the conclusion or the inference that the Commission was unduly influenced in the performance of its administrative function and in taking the action it did.

The allegations to the contrary in the complaint are mere conclusions, unsupported by any facts pleaded and are, therefore, insufficient. Isbrandtsen-Moller Co., Inc. v. United States, 300 U.S. 139, 145, 57 S.Ct. 407, 81 L.Ed. 562.

■ Again, and for reasons as cogent as they are obvious, there is a presumption of regularity that attends and supports "the official acts of public officers, and, in the absence of clear evidence to the contrary, courts will presume that they have properly discharged their official duties." United States v. Chemical Foundation Inc., 272 U.S. 1, 14, 15, 47 S.Ct. 1, 6, 71 L.Ed. 131.

■ The allegation that the plaintiff was not afforded a full and complete hearing is without foundation. The Commission, by the very nature of its duties, has the inherent power to fix the time of hearings, grant or refuse continuances, make its own rules of procedure, and to adopt and follow such methods of investigation and inquiry as will enable it best to discharge its responsibilities and the duties imposed upon it.

Of course, it follows that interested parties must be given an opportunity for hearing, but most certainly, there is nothing in the record here that would cause us to conclude to the contrary. Federal Communications Comm. v. Pottsville Broadcasting Co., 309 U.S. 134, 142, 143, 144, 60 S. Ct. 437, 84 L.Ed. 656.

Nor was the order made contrary to the evidence, in disregard of material evidence of record, nor was it arbitrary, capricious or unreasonable. •

■ The controverted matters of fact raised in proceedings of this character had been entrusted by Congress to the Commission. United States et al. v. Maher, etc., 307 U.S. 148, 154, 155, 59 S.Ct. 768, 771, 83 L.Ed. 1162.

■ The provisions of the act requiring proof of public convenience and necessity as a basis for a permit for operators, otherwise inhibited, are remedial. The so-called "grandfather" sections, 206 (a) and 209 (a), 49 U.S.C.A. §§ 306(a), 309 (a), establish exceptions and such sections must be read in harmony with the purpose of the act itself and extend to those carriers plainly within its terms, and the burden of proof is on the applicant. McDonald v. Thompson, 305 U.S. 263, 59 S.Ct. 176, 83 L.Ed. 164.

■ The "grandfather" clause, so-called, requires that the Commission in specifying in a certificate the service to be rendered shall endeavor to preserve "substantial parity between future operations and prior bona fide operations." Alton R. Co. et al. v. United States et al., 315 U.S. 15, 22, 62 S.Ct. 432, 437, 86 L.Ed. 586; United States et al. v. Carolina Freight Carriers Corporation, 315 U.S. 475, 481, 62 S.Ct. 722, 86 L.Ed. 971; Crescent Express Lines v. United States et al., 320 U.S. 401, 409, 64 S.Ct. 167, 88 L.Ed. 127.

This it is plain cannot be done where there is no substantial proof as the record indicates here, as to the nature and character of the operations of the applicant conducted on the so-called "grandfather" date.

■ The test of bona fide operation with reference to locale of operations under the "grandfather" clause must of necessity be proof of other than isolated, incidental, in-

termittent, or sporadic and infrequent service—it must be service which for want of a better term has been characterized as "substantial". United States v. Carolina Carriers Corporation, supra.

After a full hearing the Commission has found and set forth basic and primary findings, based on substantial evidence which lead as they must to the final conclusion of fact made by it and upon which its order is based. This is sufficient. Saginaw Broadcasting Co. v. Federal Communications Comm., 68 App.D.C. 282, 287, 96 F.2d 554, certiorari denied 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391; United States et al. v. Baltimore & Ohio R. R. 293 U.S. 454, 464, 465, 55 S.Ct. 268, 79 L.Ed. 587.

Upon full examination of the record we are of the opinion and hold that the finding made had a basis in substantial evidence and was not as a consequence arbitrary or capricious. Shields et al. v. Utah Idaho Cent. R. R. Co., 305 U.S. 177, 185, 59 S.Ct. 160, 83 L.Ed. 111.

The fact, as suggested that applicant may now be hauling canned goods from the so-called Del-Mar-Va Peninsula to the South, which it is argued may be necessary because of the war, has no relation to this proceeding.

The only matter before this court is the validity of the order under review.

The complaint is dismissed and parties may submit proposed findings and decrees.