**DIXIE OHIO EXPRESS, INC., Plaintiff,**

v.

**UNITED STATES et al., Defendants.**

**No. C-65-102.**

United States District Court
N. D. Ohio, E. D.

Dec. 29, 1966.

---

Clarence A. Kelley, Akron, Ohio, and Harry McChesney, Jr., McChesney & Kinker, Frankfort, Ky., for plaintiff.

Merle M. McCurdy, U. S. Dist. Atty., Cleveland, Ohio, and John H. D. Wigger, Dept. of Justice, Washington, D. C., for defendant.

Raymond M. Zimmet, Office of Gen. Counsel, Washington, D. C., for Interstate Commerce Commission.

James W. Wrape, Robert E. Joyner, Memphis, Tenn., for intervenors, Baggett Transp. Co. and Gordons Transports, Inc.

## OPINION

Before O'SULLIVAN, Circuit Judge, and BATTISTI and GREEN, District Judges.

BATTISTI, District Judge:

This is an action to enjoin, set aside, and annul certain orders of the Interstate Commerce Commission (hereinafter I.C.C.) entered in a consolidated proceeding embracing docket numbers MC–C–3945, MC–43654, and MC–43654 (Sub-No. 54). The action is brought pursuant to 28 U.S.C.A., Sections 1336, 1398, 2284, and 2321–2325; 49 U.S.C.A., Sections 17 (9), 305(g), and 305(h); and 5 U.S.C.A., Section 1009.

In 1941 the I.C.C. granted plaintiff Dixie Ohio Express, Inc.'s predecessor [1] a certificate of public convenience and necessity under the so-called "grandfather clause" contained in Section 206 (a) of the Motor Carrier Act of 1935 (49 U.S.C.A., Section 306(a) (1)). The first portion of this certificate authorized the transportation of general commodities between Akron, Ohio and Atlanta, Georgia, and Birmingham, Alabama over certain regular routes, and, further, specifi-

cally provided that the holder could serve all intermediate points on said regular routes. Following this grant of authority, the same certificate contained an additional grant, as follows:

## REGULAR AND IRREGULAR ROUTES

Tires, tubes, rubber articles, cotton factory products, cotton cord tire fabric, cotton fabrics, wooden winding cores, burlap discs, in truckloads,

Between Akron, Ohio, and points in Alabama and Georgia:

From Akron over above-specified regular routes to Alabama and Georgia State lines, thence over irregular routes to points in Alabama and Georgia, and

Return over irregular routes to the Alabama and Georgia State lines, thence over the above-specified routes to Akron.

The above-quoted portion of plaintiff's grandfather certificate is the focal point of this litigation and will be referred to hereinafter as its "regular and irregular route" authority.

On July 5, 1962, Dixie Ohio Express, Inc., (hereinafter DOX) instituted two proceedings before the I.C.C. In the first proceeding,[2] hereinafter referred to as modification proceeding, DOX sought to reopen its grandfather proceeding for the purpose of obtaining certain modifications and clarifications of its "regular and irregular route" authority. Specifically, DOX sought the following three modifications and clarifications:

1. The substitution of the phrase "textile factory products" for the phrase "cotton factory products."

2. The deletion or clarification of the phrase "in truckloads."

3. The rewording of the route description to make it clear that an irregular territorial operation south of the southern border of Tennessee could be joined at such border to each of the regular routes crossing it and then service be rendered at any of the au-

---

1. Dixie Ohio Express Co.

2. Docket No. MC–43654.

thorized intermediate points on the regular routes.

To effectuate these modifications and clarifications, DOX proposed that its "regular and irregular route" authority be amended to read as follows:

### IRREGULAR ROUTES

Tires, tubes, rubber articles, textile factory products, wooden winding cores and burlap discs,

Between points and places in Alabama and Georgia on the one hand, and, on the other, Ardmore, Alabama (Old U. S. Highway 31), Ringgold, Georgia (Old U. S. Highway 41), Dalton, Georgia (Georgia Highway 71), Wildwood, Georgia (Old U. S. Highway 11), and Cartersville, Georgia (U. S. Highway 411).

In the second proceeding,[3] hereinafter referred to as the application proceeding, DOX sought to obtain a certificate of public convenience and necessity encompassing the "modifications" and "clarifications" proposed in the modification proceeding. This relief was sought only in the event that the relief requested in the modification proceeding was denied.

By an order entered October 2, 1962, the I.C.C. on its own motion instituted an investigation under Sections 204(c) and 212(a) of the Interstate Commerce Act to determine whether DOX, in violation of Sections 206(a) and 209(a) of the Act, 49 U.S.C.A., Sections 306(a) (1), 309(a) (1), had been transporting in interstate commerce certain shipments of tire fabric from Rockmart, Georgia to Cincinnati, Ohio without a permit or certificate authorizing the same. This third proceeding[4] will hereinafter be referred to as the investigation proceeding.

The three proceedings were consolidated before an I.C.C. hearing examiner because one issue was common to each, that is to say, whether DOX was, or should be authorized to serve intermediate points while traversing its regular routes pursuant to its "regular and irregular route" authority. Eight motor carriers filed protests.

On April 8, 1963, the I.C.C. hearing examiner served a lengthy recommended report and order. In his recommended report and order the hearing examiner first observed that for many years DOX transported from two to fifteen truckloads of tire fabric a month from Rockmart, Georgia to Cincinnati, Ohio; and that until the I.C.C.'s order of October 17, 1962, DOX had been given no formal notice that its right to render such service was in any manner questionable. The hearing examiner then noted that the propriety of rendering such service depended on whether the grandfather certificate authorized DOX to serve intermediate points while traversing its "regular routes" north of the Alabama and Georgia state lines pursuant to the "regular and irregular route" authority.

The I.C.C.'s Bureau of Inquiry and Compliance contended that the reference to DOX's "regular routes" in the "regular and irregular route" portion of its certificate did not authorize service to all intermediate points on the regular routes, but, rather, merely indicated the routes which DOX was authorized to use pursuant to a radial irregular route grant with Akron as its "base point" and points in Alabama and Georgia as its "service territory."[5] DOX contended that the

---

3. Docket No. MC 43654 (Sub-No. 54)

4. Docket No. MC–C–3945.

5. Such a radial irregular grant could, and ordinarily would, be phrased in the following manner: Between Akron, Ohio, on the one hand, and, on the other, points in Georgia and Alabama. Under such a grant Akron would be the "base" and Alabama and Georgia the "service territory." Such a grant would require that every shipment be moved from the "base" to a point in the "service territory," or vice-versa, and would prohibit the holder from cross-hauling between two points within the service territory. Since every shipment must be hauled from the "base" to the "service territory," the particular routes which are followed in traveling between the "base" and the "service territory" would be a matter of little or no practical significance.

reference to its "regular routes" in the regular and irregular route" portion of its certificate indicated that it could, while traversing its regular routes north of the Alabama and Georgia borders, serve all intermediate points in the same manner that it could do so under the preceding "regular route" portion of its certificate.

The hearing examiner concluded that the evidence in support of DOX's grandfather application could have justified a grant of authority to points in addition to Akron; and, further, that this was the apparent reason for the grant of "regular and irregular" authority. The examiner further concluded that the use of the phrase "regular and irregular routes" indicated that a portion of the authority granted under such heading was intended to be "regular route" authority carrying with it the appurtenant right to serve intermediate points. Noting that the "regular and irregular route" portion of the certificate makes reference to the "regular routes" described in the preceding "regular route" portion of the certificate, the hearing examiner concluded that the extent of DOX's "regular route" authority under the "regular and irregular" grant must be ascertained by making reference to said "regular route" authority. As stated by the examiner:

> "It is the examiner's opinion that the portion of DOX's grandfather certificate involved herein had the effect of authorizing DOX to transport the commodities specified therein between points in Georgia and Alabama, on the one hand, and, on the other, points where DOX's regular routes cross the southern boundary of Tennessee, over irregular routes, and thence over DOX's regular routes to all points where DOX is authorized to serve, north of these crossings. Since DOX's regular route authority includes service at all intermediate points, DOX is authorized to transport tires, etc., including tire fabric between points in

Alabama and Georgia, including Rockmart, Georgia, on the one hand, and, on the other, intermediate points on DOX's regular routes north of the Tennessee State line to Akron, Ohio, including Cincinnati, Ohio and other intermediate points."

In light of his finding that DOX had authority to serve Cincinnati, the hearing examiner recommended that the investigation proceeding be dismissed.

In his discussion of the modification proceeding, the hearing examiner first noted that the same evidence was offered in the application proceeding. In his report and order, however, the hearing examiner did not analyze the evidence in terms of the proofs required for the granting of the relief requested in the application proceeding. This may be accounted for by the fact that he ultimately found that DOX was entitled to the relief it sought under the modification proceeding, and, therefore, that the application proceeding should be dismissed.

With regard to the route description problem, the hearing examiner recommended that the "regular and irregular" portion of DOX's certificate be modified to provide irregular route authority "between Louisville and Lexington, Kentucky, on the one hand, and on the other, points in Alabama and Georgia." This recommendation was not entirely consistent with his earlier conclusion that the "regular and irregular route" portion of DOX's certificate already authorized it to serve all intermediate points while traversing its regular routes north of the Alabama and Georgia borders.[6] Under the modification recommended by the hearing examiner, DOX would be authorized to serve only those points on its regular routes which are north of Louisville and Lexington rather than all points on said routes north of the Alabama and Georgia borders. In taking this inconsistent position the hearing examiner was evidently attempting to allay the protest-

6. While phrased in a somewhat different manner, the "modification" sought by DOX was, for all practical purposes, completely consistent with the authority the hearing examiner had previously found DOX to have.

ants' fear that DOX might render service between points within the service territory of Alabama and Georgia.[7]

With regard to the commodity description modification, the hearing examiner, after carefully reviewing the extensive evidence, concluded that:

"Briefly, the evidence of record indicates that DOX has been transporting from points in Georgia and Alabama, textile products, regardless of whether composed of cotton or synthetic fabrics. These products range from yarn to finished garments. There is no difference between a 'textile factory' and a 'cotton factory,' the term 'cotton factory' having originated when the principal fibre of the textile industry was cotton. With the development and subsequent use of synthetic fibre, the description used in DOX's original certificate had become outmoded. The examiner concludes that the commodity description should be revised to substitute the term 'textile products' for 'cotton factory products' as presently used in DOX's certificate."

On the evidence submitted with regard to the truckload restriction in DOX's certificate, the hearing examiner concluded that the same had presented no serious difficulty. However, he recommended that, in line with the I.C.C. policy, the truckload restriction should be eliminated.

All of the parties, including DOX, filed exceptions to the examiner's report and recommended order. The matter then went before Division I of the Interstate Commerce Commission. On March 30, 1964, the Commission served a printed report (94 MCC 625) reversing the hearing examiner, and making the following

observation relative to the hearing examiner's findings of fact:

"The statement of facts in the report of the examiner is accurate in most respects and, as hereinafter supplemented, is adopted as our own." (94 MCC 625, 630.)

In its report, the Commission first considered the issues raised in the investigation proceeding. It observed that while DOX's grandfather decision, Dixie Ohio Express Co. Common Carrier Application, 17 MCC 735, used words of extremity in connection with the "regular and irregular" route authority, those words were not included in the certificate which was ultimately issued on February 13, 1941.[8]

It further said:

"We are unable to agree with the examiner or DOX that the Akron portion of its certificate permits the tacking of the irregular-route segment at the five border points with DOX's authorized regular routes in order to serve points thereon, such as Cincinnati. Although the words of extremity used in the findings in Dixie Ohio Exp. Co. Common Carrier Application, supra, were omitted when drafting the 'grandfather' certificate, this does not negative the conclusion that the Akron portion of the DOX certificate clearly confers, for all practical purposes, radial authority with Akron as a base point over a combination of regular routes set out in another portion of the certificate, and irregular routes in Alabama and Georgia fanning out from the regular routes where they cross the Tennessee-Alabama and Tennessee-Georgia State lines. The reference made to the use of regular routes in such radial authority does not auto-

---

7. Such service would be accomplished by first hauling the commodities in question from points in Alabama or Georgia to the northern border of Alabama or Georgia and then back to other points in Georgia or Alabama. The inconsistent position taken by the hearing examiner may be accounted for by the fact that DOX had indicated that it had not ren-

dered such service in the past, and it did not desire or intend to render such service in the future.

8. The words of extremity, "on the one hand * * * and on the other," are synonymous with a grant of irregular route authority. Such irregular authority generally does not contemplate service to intermediate points.

matically confer with it the authority to split up a single grant such as here considered into separate portions for tacking purposes, or to serve intermediate points on the referred-to regular routes in the absence of specific authorization therefor. As has been noted, such construction would broaden considerably the authority originally granted. Moreover, we are not required to indicate in authorities issued by us what the holder thereof is not authorized to do. United Truck Lines, Inc., Ext.-Malaga Reduction Plant, 64 M.C.C. 535, 539. Clearly, DOX is without authority to perform the operations which are at issue in the investigation proceeding."

The Commission characterized DOX's conduct as follows:

"DOX's construction of its certificate, heretofore described, is strained and untenable. The radial nature of the Akron portion and the absence of any affirmative statement indicating that service is authorized at any intermediate point placed DOX on notice of the limitations of the certificate. Moreover, it may reasonably be expected that a certificate holder would familiarize itself with the decision wherein the considered authority was granted if it entertained doubts respecting the terms of its authority. In the circumstances, we think the unauthorized operations performed by DOX to Cincinnati were willful."

 We are bound by the Commission's construction of the DOX certificate unless it is clearly erroneous, arbitrary, or capricious. See Nelson, Inc. v. United States, 355 U.S. 554 at 558, 78 S.Ct. 496, at 499, 2 L.Ed.2d 484 (1958), wherein the Court said that:

"* * * In ascertaining that meaning (of words in a grant of authority), we are not given carte blanche; just as '[t]he precise delineation of an enterprise which seeks the protection of the "grandfather" clause has been reserved

for the Commission,' Noble v. United States, 319 U.S. 88, 93 [63 S.Ct. 950, 952, 87 L.Ed. 1277] (1943), subsequent construction of the grandfather permit by the Commission is controlling on the courts unless clearly erroneous. Dart Transit Co. v. Interstate Commerce Comm'n. [D.C.] 110 F.Supp. 876, aff'd., 345 U.S. 980 [73 S.Ct. 1138, 97 L.Ed. 1394] (1953)."

We are also bound to acknowledge and give weight to the expertise of the Commission. As a corollary to these general principles, it is incumbent upon the Commission to favor us with sufficient factual findings from which we may determine whether it has properly executed its substantial responsibility. Nashua Motor Express, Inc. v. United States, et al., 230 F.Supp. 646. (D.N.H.1964.)

Here, the Commission has categorically stated that DOX "willfully" violated the terms of its certificate in transporting tire fabric from Rockmart, Georgia to Cincinnati, Ohio. This conclusion is predicated upon its finding that the certificate and the record of the grandfather proceeding clearly indicated to DOX that it did not have authority to render such service. Viewed against the carefully considered finding of the hearing examiner that DOX had authority to render such service, the Commission's categorical statement that DOX acted willfully in rendering the same appears to us to be most incongruous.[9]

 Of course, the Commission was not obligated to follow the hearing examiner. However, in view of his recommended finding, it seems, even at first glance, somewhat tenuous to conclude "willfulness" on the ground that it should have been clear to DOX from a mere reading of the certificate and grandfather decision that it did not have the authority in question.

All parties agree that the form of the "regular and irregular route" grant is unique. From the title itself a reasonable inference might be drawn that the

9. This is not unlike the situation which prevailed in Bowman Transportation, Inc.

v. United States, et al., 211 F.Supp. 354 (N.D.Ala.M.D.1962).

grant includes certain regular route authority joined with irregular route authority. From the body of the "regular and irregular route" grant, it might likewise be reasonably inferred that the grant contemplated the joinder of the regular route authority described in the preceding portion of the certificate with irregular route authority south of the Alabama and Georgia borders.

As DOX observed, if it had been contemplated that the authority was to be irregular route radial authority, the grant could, and ordinarily would have been framed in the following uncomplicated terms:

> Between Akron on the one hand and points in Georgia and Alabama on the other.

From the fact that such an uncomplicated route description was not employed, clearly one might, from a reading of the certificate alone, most reasonably infer that something other than irregular route radial authority was contemplated, or more specifically, that by making reference to the preceding regular route authority it was intended that said regular route authority, including the right to serve intermediate points, was thereby incorporated by reference to the "regular and irregular route" grant.

The decision in DOX's grandfather proceeding included *inter alia* the following finding:

> "We find that applicant was on June 1, 1935, and continuously since has been, in bona fide operation as a common carrier by motor vehicle in interstate or foreign commerce * * * of tires, tubes, rubber articles, cotton factory products, cotton cord tire fabric, cotton fabrics, wooden winding cores, and burlap discs, in truckloads, between Akron on the one hand, and points in Alabama and Georgia, on the other, over said regular routes to the Alabama and Georgia State lines and thence over irregular routes to points in those States, and return over the same routes; and that applicant is en-

titled to a certificate authorizing the continuance of such operations."

As the Commission observed, the words of extremity appearing in the above-quoted portion of the grandfather decision were not incorporated in the certificate ultimately issued to DOX. In its report the Commission seems to say that since words of extremity appeared in the grandfather decision DOX was thereby put on notice that its authority under the "regular and irregular route" portion of its certificate was irregular route radial authority. What the Commission has failed to recognize is that throughout the grandfather decision words of extremity were employed in an entirely inappropriate manner. It seems clear to us that words of extremity were deleted from the certificate not through any inadvertence but, rather, in recognition of the fact that they were improperly used in the decision. If anything, the deletion of the words of extremity tends to indicate that the grant was not to be strictly an irregular route radial grant. Under these circumstances, it seems unreasonable to conclude from the mere fact that words of extremity appeared in the grandfather decision, that DOX was put on notice that the grant in question was an irregular route radial grant.

It seems equally unreasonable to conclude from the mere fact that the certificate uses the words "between Akron, Ohio and points in Alabama and Georgia" that the grant is necessarily one of irregular route radial authority.

As has already been observed, the crucial question which must be resolved in construing the "regular and irregular route" portion of the DOX certificate is whether the reference to DOX's regular routes in the "regular and irregular route" portion of the certificate authorized service to all intermediate points on said regular routes in the same manner as provided in the "regular route" portion of the certificate.

As reflected in DOX's grandfather decision, the evidence admitted in the grandfather proceeding applicable to

DOX's service to intermediate points on its regular routes between Birmingham and Atlanta and Akron is far from clear. For example, in a number of places within the grandfather decision the Commission makes reference to the paucity of evidence relative to such service. Notwithstanding this fact, the "regular route" portion of the certificate ultimately issued provided that DOX could serve all intermediate points on its regular routes. The evidence applicable to service to intermediate points on the "regular and irregular route" portion of the certificate is likewise unclear. Even from a most careful reading of the grandfather decision it is impossible to entirely segregate the discussion of the evidence bearing upon service to intermediate points on the "regular and irregular route" portion of DOX's certificate from that bearing upon the "regular route" portion of DOX's certificate. At one point in the decision, however, the Commission makes reference to the fact that DOX had agreed that in traversing Tennessee and Kentucky it was willing to be restricted to its regular routes. Before this Court it has been urged that this "concession" by DOX clearly indicated that DOX knew it did not have authority to serve intermediate points while traversing its regular routes pursuant to its "regular and irregular route" authority.

However, from our reading of the grandfather decision, DOX's "concession" could very well be interpreted to mean that in carrying the special commodities pursuant to the "regular and irregular route" authority DOX was willing to have its authority north of the Georgia and Alabama borders limited to the same extent that it was to be limited under its regular route authority or, in other words, the joinder of irregular route service with its regular route authority (including service to all intermediate points) at the Georgia and Alabama borders. The fact that the grant was ultimately given the title "regular and irregular routes" would seem to fortify this interpretation of the DOX "concession." Further, if it had been contemplated that the service in question was to be strictly irregular route radial authority, there is no discernable reason why the certificate designated the particular routes to be traversed.

■■ As noted above, the Commission has categorically stated that it should have been clear to DOX, from a reading of the certificate and grandfather decision, that it did not have authority to render the questioned service to Cincinnati, and, therefore, that DOX's conduct in rendering the same was willful. We conclude that the "regular and irregular route" portion of the DOX certificate is clearly ambiguous; that the grandfather decision does not clearly indicate that DOX is not entitled to serve all intermediate points while traversing its regular routes north of the Georgia and Alabama borders; and that the Commission's finding of willfulness, predicated only upon a reading of the certificate and the grandfather decision, is clearly erroneous.

■ There is nothing in the Commission's report to indicate that, in reaching the conclusion that the "regular and irregular route" portion of DOX's grandfather certificate did not authorize service to intermediate points on the regular routes, it either recognized or gave consideration to many of the significant circumstances alluded to above. The Commission's findings may at best be categorized as superficial. While, as we have already noted, the findings and conclusions of the Commission are entitled to great weight, it is incumbent upon the Commission to present us with sufficient findings and reasoning from which we may ascertain whether its conclusions are predicated upon a fair and reasonable analysis of the pertinent facts and circumstances. In reaching the conclusion that the "regular and irregular route" portion of DOX's grandfather certificate does not authorize service to intermediate points on its regular routes north of the Georgia and Alabama borders, the Commission has not so provided us with sufficient findings or reasoning. Thus, we

**1002**

are compelled to remand the matter for further consideration and findings.

Obviously, the matters just discussed are significant not only with regard to the investigation proceeding but also with regard to the modification and application proceedings. In support of the relief sought in the modification proceeding, DOX did not present evidence with a view toward showing that the route description contained in its grandfather certificate was wrong, but, rather, merely sought to have the Commission determine whether its certificate authorized service to intermediate points while traversing its regular routes north of the Alabama and Georgia borders. (DOX brief, pp. 36–37.) Therefore, DOX did not introduce any evidence to the effect that on or before June 1, 1935, it had served points other than Akron while hauling the special commodities from points in Alabama and Georgia other than Atlanta and Birmingham.

■ Notwithstanding DOX's contention to the contrary, it is clear that an applicant for grandfather authority must establish that it was conducting operations consistent with the authority sought on or before June 1, 1935. See Alton Railroad Co. et al. v. United States et al., 315 U.S. 15, 62 S.Ct. 432, 86 L.Ed. 586 (1942).[10] Since in the present proceeding DOX offered no evidence of service to intermediate points on or prior to June 1, 1935, the only source from which the Commission could obtain any indication of such service was the original grandfather decision. Hence, insofar as the route description aspect of the modification proceeding was concerned, the Commission was, for all practical purposes, confronted with the question of whether under all the circumstances the "regular and irregular route" portion of the grandfather certificate should be construed to include the right to serve intermediate points while traversing the regu-

lar routes north of the Alabama and Georgia borders. Since this question and the Court's findings with regard to the same have already been discussed in detail, no useful purpose would be served by repetition.

If, on the remand, the Commission should determine that the "regular and irregular route" portion of DOX's grandfather certificate does not authorize it to serve intermediate points while traversing its regular routes north of the Alabama and Georgia borders, there remains whether DOX should be granted this authority in the application proceeding.

■ Before specifically discussing the route description aspect of the application proceeding, some general observations should be made with regard to the Commission's findings and conclusions relative to the application proceeding. Notwithstanding the fact that DOX's application prayed for three separate and distinct grants of authority, the Commission chose to draft its findings and conclusions in such a manner that it is difficult in many respects, and impossible in others, to determine the particular aspect of the application to which the same are directed. Aside from failing to adequately distinguish between the three aspects of DOX's application, the Commission has disposed of DOX's claims with general statements predicated upon rather vague reasoning and inadequate findings as to the subsidiary facts. While, as previously noted, the Commission's findings are entitled to great weight, we must be able to ascertain whether its conclusions are predicated upon a fair and reasonable analysis of the pertinent subsidiary facts and circumstances. The Commission's findings with regard to the application proceeding fall short of this standard. Accordingly, we must remand for further consideration and findings.

10. Of course, evidence as to shipments made after June 1, 1935, may shed some light on the exact scope of operations conducted prior to the critical date of June 1, 1935. See Jarman v. United States, 219 F.Supp. 108 (D.Md.1963).

As to the route description aspect of the application proceeding, DOX urges that the Commission erred in failing to consider and weigh the fact that it had, for many years and without challenge, rendered a significant volume of service to intermediate points while traversing its regular routes pursuant to its "regular and irregular route" authority. It seems clear from a careful reading of the Commission's findings that said service was not taken into consideration by the Commission in determining whether the public convenience and necessity required the grant of authority sought.

As we have previously found, the rendering of service to intermediate points did not constitute a willful violation of the terms of DOX's grandfather certificate. On the contrary, DOX clearly rendered such service under claim of right. In view of this circumstance the Commission erred in failing to consider and to weigh such service in determining whether the public convenience and necessity required the grant of authority sought. Bowman Transportation, Inc. v. United States, 211 F.Supp. 354 (D.C.1962). Nashua Motor Express, Inc. v. United States, 230 F.Supp. 646 (D.C.1964).

It is not entirely clear from a reading of the Commission's findings what standard was employed in determining whether "public convenience and necessity" required the grant of authority in question. We find that the standard set forth in Nashua Motor Express, Inc. v. United States, supra, is appropriate.

The "principal" relief which DOX sought by way of the modification and application proceedings was the modification of the commodity description of the "regular and irregular route" portion of its grandfather certificate. The basic thrust of DOX's position before the Commission was that if the phrase "cotton factory products," as used in its grandfather certificate, was considered to be a limitation as to fabric content, the terminology was inappropriate in that during the grandfather period cotton factories used a certain percentage of synthetic fibers. DOX produced extensive evidence on the evolution of the industry showing that the percentage of synthetics used has so drastically increased that the phrase "cotton factory products" is now obsolete and should be replaced by the phrase "textile factory products." DOX also introduced evidence to the effect that it had over the years shipped substantial quantities of these materials which should be more appropriately categorized as "textile factory products." In seeking to have its certificate modified to read "textile factory products" DOX sought to have it made clear that it could continue to haul such materials.

On the basis of the evidence submitted by DOX, the hearing examiner, as noted above, concluded:

" * * * [T]hat DOX has been transporting from points in Georgia and Alabama, textile products, regardless of whether composed of cotton or synthetic fabrics. These products range from yarn to finished garments. There is no difference between a 'textile factory' and a 'cotton factory,' the term 'cotton factory' having originated when the principal fibre of the textile industry was cotton. With the development and subsequent use of synthetic fibre, the description used in DOX's original certificate has become outmoded. The examiner concludes that the commodity description should be revised to substituting the term 'textile products' for 'cotton factory products' as presently used in DOX's certificate."

The Commission evidently agreed with DOX's position relative to the history of the industry, for at page 633, 94 M.C.C., it stated:

"During the 'grandfather' period the so-called cotton factory mills' products consisted of fibers and fabrics made mainly from cotton and a small proportion of rayon. Since the World War II period the mills' use of synthetic fibers has increased substantially, particularly in the production of

fabrics for industrial uses and wearing apparel."

After making this observation, the Commission, completely ignoring the basic thrust of DOX's position, went on to deny the relief sought on the basis of broadly stated conclusions. Even from a most careful reading of the Commission's report, it is impossible to determine which of the Commission's broadly stated conclusions are applicable to the commodity description problem rather than the route description problem.

■ In the joint brief submitted by the United States and the Interstate Commerce Commission, the following observations are made:

" * * * While there might have been a technological advance in the textile industry in the last twenty years, DOX did not simply come before the Commission to have its commodity description clarified with regard to its transportation between Akron and points in Alabama and Georgia.

"In the past few years, DOX has been authorized by the Commission to transport certain textile products between Akron and points in Alabama and Georgia. It received such authority in Dixie Ohio Express Extension Textiles, Docket No. MC–43654 (Sub-No. 44) (1961) (not printed in Commission's official reports).

"But, the authority to transport textiles between Akron and Alabama and Georgia points is not what DOX sought by its application in the proceeding which is under review in this Court. Instead, it sought to transport textiles and textile products—the term 'textile factory products' is the plaintiff's creation—from points and places in Alabama and Georgia to the five points in Alabama and Georgia. This was an entirely new service that was proposed, and it required DOX to prove a public need for it. * * * "

It would seem, from the above-quoted language, that it is now being urged on behalf of the Commission that the commodity description relief sought by DOX was properly denied because the same was sought in conjunction with the route description relief which the Commission concluded to be unwarranted. Clearly, however, the commodity description problem and the route description problem must be viewed independently. The fact that DOX may not be entitled to the one category of relief in no manner reflects upon the propriety of granting the other.

■ The Commission, in denying the commodity description relief, did not discuss, and thus presumably did not give any weight to the hearing examiner's finding that there is no difference between a "cotton factory" and a "textile factory." Further, except for the brief observation quoted above, it did not discuss, and thus presumably did not give any weight to the expert testimony tending to show a dramatic increase in the use of synthetics which might render the phrase "cotton factory products" obsolete. The Commission also failed to discuss, and thus, presumably, did not give any weight to the evidence introduced by DOX tending to show that over the years substantial quantities of materials were hauled which might be more appropriately categorized as "textile factory products." [11]

■ In effect, the Commission has ignored the evidence offered by DOX relative to the history of the industry and the nature of its service to the same. It is clear that such evidence cannot be ignored since it is material to the issues raised by DOX. See L. Nelson & Sons Tsp. Ext., 62 M.C.C. 271, affirmed 63 M.C.C. 805, affirmed as A. B. & C. Motor Transp. Co. v. United States, 151 F.Supp.

11. Since the Commission did not indicate that DOX was not entitled to render such service, as it had done in the case of the route description problem, it would seem that the Commission considered DOX's present certificate to authorize the hauling of the products containing synthetics.

367 (D.C.1956). Under these circumstances, it is not possible for us to determine the basis upon which the Commission concluded that DOX was not entitled to a modification of the commodity description. Therefore, the commodity description issue must be remanded for further consideration and findings of fact.

■ In denying the relief sought by DOX with regard to the "in truckloads" restriction, the Commission made the following brief observation:

> "In the absence of a definite showing of need for the proposed service we must deny the authority requested, including that part seeking removal of the truckload restriction which we normally no longer impose. B. & M. Exp., Inc. v. Bowman Transp., Inc., 73 M.C.C. 109, and Film Transport Co. Ext.—Elimination of Restriction, 71 M.C.C. 743."

Here, again, the Commission made no finding relative to DOX's request for a clarification to the effect that the "in truckloads" provision allows DOX to haul amounts which would have constituted a truckload as of the 1935 grandfather date when trucks of that vintage were of a lesser carrying capacity. Also, it is notable that subsequent to the ruling in the instant case the Commission, on its own motion, instituted a proceeding " * * * to determine whether the removal of 'truckload lot' restrictions from all existing certificates of public convenience and necessity issued pursuant to section 206 or 207 of the Interstate Commerce Act * * * is required by the present or future public convenience and necessity." See Ex Parte No. MC–68, "Removal of Truckload Lot Restrictions."

In view of the Commission's failure to make the material finding above noted, and in view of Ex Parte No. MC–68, supra, it would seem the wisest course to remand the issue presented by the "in truckloads" provision for further consideration and findings.