BRADY TRANSFER & STORAGE CO. (IRREGULAR ROUTE COMMON CARRIER CONFERENCE OF AMERICAN TRUCKING ASSOCIATIONS, Inc., Intervener) v. UNITED STATES et al. (REGULAR COMMON CARRIER CONFERENCE OF AMERICAN TRUCKING ASSOCIATIONS, Inc., Intervener).

No. 834.

United States District Court
S. D. Iowa, Central Division.

Sept. 3, 1948.

Judgment Affirmed Dec. 6, 1948.

See 69 S.Ct. 239.

Nuel D. Belnap and Walter, Burchmore & Belnap, all of Chicago, Ill., and Rex H. Fowler and Bradshaw, Fowler, Proctor & Fairgrave, all of Des Moines, Iowa, for plaintiff.

Gordon C. Locke, of Washington, D. C., for Interstate Commerce Commission.

Edward Dumbauld, Sp. Asst. to Atty. Gen., Gordon C. Locke, of Washington, D. C., and Cloid I. Level, Asst. U. S. Atty., of Des Moines, Iowa, for the United States.

H. F. Gillis, of Washington, D. C., for Irregular Route Common Carrier Conference of American Trucking Associations, Inc., intervening plaintiff.

Franklin R. Overmyer, of Chicago, Ill., and Robert J. McBride, of Washington, D. C., for Regular Common Carrier Conference of American Trucking Associations, Inc., intervening defendant.

Before WOODROUGH and COLLET, Circuit Judges, and DEWEY, District Judge.

COLLET, Circuit Judge.

The plaintiff, Brady Transfer & Storage Company, which will hereinafter be referred to as Brady, carries on extensive operations as a common carrier by motor vehicle under certificates issued by the Interstate Commerce Commission. Brady was so engaged prior to the effective date of the Motor Carrier Act of 1935, now Part II of the Interstate Commerce Act, 49 U.S.C.A. §§ 301–327. In due time after the effective date of the above Act, Brady applied to the Commission under the so-called Grandfather Clause, 49 U.S.C.A. § 306(a), for authority to continue the operations then engaged in Pursuant to the authority of the Act, 49 U.S.C.A. § 306(a), Brady continued in the prosecution of its business pending final determination of the foregoing application. Originally the applications made were for several individual certificates. Among those applications authority was requested for the right to operate as a regular route common carrier of freight over specified routes serving specified points in many states and over a large area. After several years several of such regular route certificates were issued. None of them are in controversy in this action. One of the applications that Brady originally made under the Grandfather Clause was for authority to operate as an irregular route common carrier of freight. That application requested among other things authority to operate between St. Paul and Minneapolis, Minnesota, and all points in the State of Iowa. The application was not exactly so worded but for present purposes the question at issue will be simplified by referring to it in that manner. This application had a somewhat hectic course. Originally the Commission, in 1940, 23 M.C.C. 767, issued a report in which the conclusion was stated that Brady had been operating as a common carrier of freight over an irregular route between those points and that specified area, and that the certificate should be granted on that ground. After reconsideration the Commission issued a report denying the irregular route certificate. Subsequent hearings and rehearings finally resulted in the issuance in 1944 of a certificate authorizing among other things irregular

route service substantially as requested in the application. In 1947 all of Brady's certificates were consolidated into one. In the meantime, however, in 1941 the Commission instituted on its own motion an investigation to determine whether Brady was actually carrying on an operation between St. Paul and Minneapolis, Minnesota, on the one hand and Spencer and Fort Dodge, Iowa, on the other which exceeded the authority requested in its application for an irregular route between those points. After an extensive investigation by the Commission and participation in the proceedings by many interested parties, all or most of whom have intervened in the present action, the Commission issued its report stating the conclusion that Brady was not carrying on an irregular route operation within the meaning assigned to that term by the Commission and ordering him to cease and desist from exceeding the authority which he had applied for and which had been given him to operate between those points as an irregular route carrier in 1944. The report last referred to was issued in February, 1947. 47 M.C.C. 23. The effective date of this order has been extended from time to time, permitting the bringing of this action and has, since the action was brought, been further extended at the request of and for the convenience of the Court to permit the disposition of this action before the effective date of the order.

This action is brought under 28 U.S.C.A. §§ 1336, 1398, 2284, 2321–2323, 2325, challenging the validity of the Commission's order directing Brady to cease exceeding its irregular route authority between St. Paul and Minneapolis, Minnesota, and Spencer and Fort Dodge, Iowa. The usual statutory three-judge Court was convened and the cause submitted upon the pleadings, stipulation and affidavit. The material facts are not in dispute. Brady concedes, for the purposes of this case, that the evidence before the Commission supports its factual findings in which the operations conducted by Brady are described. Brady does not concur, however, in the conclusion of the Commission that those facts demonstrate an exercise of authority in excess of that granted and possessed by Brady under the irregular route certificate. A brief outline of the factual situation will materially clarify the legal differences now in dispute.

As heretofore noted, Brady was operating extensively as a motor carrier of freight prior to 1935. Incident to those operations occasions presumably arose, again presumably comparatively infrequent, for Brady in its capacity as a common carrier, holding itself out to the public as ready, able and willing to carry freight anywhere, for it to transport freight from St. Paul and Minneapolis to indiscriminate points in Iowa. We say "presumably" because that kind of an operation is the type of business which historically and customarily provoked the type of application which Brady filed—a request for irregular route authority between St. Paul and Minneapolis on the one hand and all points in Iowa on the other. Again, presumably, Brady was not operating between St. Paul and Minneapolis on the one hand and all points in Iowa on the other at that time or any time nor was it necessary for it to be so operating in order to justify the application for and the issuance of a certificate as an irregular route carrier. Alton Railroad Company v. United States, 1942, 315 U.S. 15, 21, 62 S.Ct. 432, 86 L.Ed. 586. As time went on Brady saw the opportunity of increasing materially the volume of business and the profits resulting from its operation by the establishment of regular scheduled trips, the solicitation of business between St. Paul and Minneapolis and Spencer and Fort Dodge, Iowa, the advertisement to the general public, and the solicitation of shippers upon the basis that regular scheduled daily service was offered between St. Paul and Minneapolis on the one hand and Spencer and Fort Dodge on the other. Considerable business was built up as the result. The Commission concluded that this new systematic, regular scheduled service given by Brady between St. Paul and Minneapolis on the one hand and Spencer and Fort Dodge on the other constituted a change in the *type* of the operation which Brady had been giving prior to 1935 and which it had requested authority to continue under the Grandfather Clause and which it had been granted authority to continue by the issuance of the irregular route certificate.

That conclusion was based upon the consideration of eight factors set forth in the Commission's extensive report. 47 M.C.C. 23, 43-56 (1947). The Commission expressly disavows any intent to curtail the volume of Brady's irregular route business between these points. With equal clarity and positiveness it renounces any intent or power to curtail the number of trips which Brady makes between St. Paul or Minneapolis and Spencer or Fort Dodge under the irregular route certificate. It states in its report (47 M.C.C. 23) (1947), in the language of the experts in that field, with a meticulous care as to terminology which we will not undertake to emulate or improve upon for the very good reason that it is not within the province of this Court to do so, why the present operations by Brady as demonstrated by the conceded facts represent a change in the *type* of its operations from those of an irregular route carrier to those of a regular route carrier

The question of primary importance presented in this case is stated by Brady in its brief as follows:

"Does the term 'irregular routes' as used by the Commission in the Brady certificate constitute a specification only of the highways which the carrier is authorized to traverse—any and all available highways—or does it mean more and constitute a limitation on service and a prohibition of certain operating practices, so that the Commission can now require Brady to refrain from such practices on the ground that they are not authorized by the initial grant?"

As amplified in the argument, this contention amounts to an assertion that the service given by Brady prior to the effective date of the Motor Carrier Act and which was made the premise of the application for the irregular route certificate under the Grandfather Clause of that Act is relevant only to the determination of the area or points which may be served under the irregular route certificate, with the result that after the issuance of the irregular route certificate granting authority to operate between a given point or points and a specified area or points therein the quantity of such service may be increased under the authority of 49 U.S.C.A. § 308(a) [1] to an unlimited extent with such improvements in service as an increase in the quantity of service may make appropriate, although those refinements and improvements may convert a one-time coincidental operation between St. Paul and Minneapolis on the one hand and Spencer and Fort Dodge on the other into a regular, periodical, scheduled, systematic, "regular route" operation between those points.

The further objections to the validity of the Commission's order are advanced to the effect that (1) the Commission does not have the power to impose the limitations asserted to have been made; (2) the Motor Carrier Act does not recognize or permit the classification of common carriers of property into irregular route carriers and regular route operators; (3) the classification section of the Act, 49 U.S.C.A. § 304(b), does not give the Commission power to classify common carriers of property into the above classes; (4) the Commission does not have the power to restrict the service of an irregular route common carrier for the purpose of improving the competitive position of regular route carriers; and (5) the assailed order violates the due process clause of the Fifth Amendment in that it (a) is invalid for uncertainty, and (b) is discriminatory because it imposes a classification with accompanying restrictions upon irregular route operators without any reasonable relation to the purpose of the Act. These further contentions will largely be answered by the determination of the more important question above stated.

The basic underlying dispute in this case is whether Brady has simply increased the quantity of the service it is authorized to give under its irregular route certificate or whether, as the Commission concluded, it has changed the *type* of its operation from that of an irregular route

---

[1] "* * * Provided, however, That no terms, conditions, or limitations (in the certificate) shall restrict the right of the carrier to add to his or its equipment and facilities over the routes, between the termini, or within the territory specified in the certificate, as the development of the business and the demands of the public shall require."

carrier to that of a regular route carrier. For it cannot be seriously contended that the Act of Congress does not contemplate two types of common carriers i. e. irregular route carriers and regular route carriers. United States v. Maher, 307 U.S. 148, 155, 59 S.Ct. 768, 83 L.Ed. 1162; Crescent Express Lines, Inc., v. U. S., 320 U.S. 401, 64 S.Ct. 167, 88 L.Ed. 127. It is true that the cases just cited deal with the carriage of passengers but we see no valid reason why the principles announced by the Supreme Court in those cases should not apply equally to the carriers of property. Nor can there be serious doubt that Congress granted to the Commission the authority to classify common carriers of property and a fortiori the right to establish the classifications of irregular route carriers and regular route carriers if, of course, there be a reasonable factual basis therefor, since Congress specifically conferred that power by Section 304(b), 49 U.S.C.A., as follows:

"The Commission may from time to time establish such just and reasonable classifications of brokers or of groups of carriers * * * as the special nature of the services performed by such carriers * * * shall require; and such just and reasonable rules, regulations and requirements, consistent with the provisions of this chapter, to be observed by the carriers * * * so classified or grouped, as the Commission deems necessary or desirable in the public interest."

With the premise established that the Commission has the power to classify common carriers of property, our inquiry leads to the determination of the question of whether that power was properly exercised by the classification of common carriers of property into irregular route and regular route operators. It is reasonably clear from the Act itself that Congress recognized a necessity for distinguishing between these two *types* of operators[2] but it is apparent from the specific authorization which Congress conferred upon the Commission to classify carriers that it—the Congress—was not undertaking to actually make the classification but preferred to leave that to the considered judgment of the experts in that field.

■ Was the classification a reasonable one and based upon a justifiable factual

[2] 49 U.S.C.A. § 303(a) (14) "The term 'common carrier by motor vehicle' means any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, *whether over regular or irregular routes*, except * * *" (Emphasis supplied.)

49 U.S.C.A. § 304(b) quoted supra in the body of this opinion.

49 U.S.C.A. § 306(a) "Except as otherwise provided in this section and in section 310a, no common carrier by motor vehicle subject to the provisions of this chapter shall engage in any interstate or foreign operation on any public highway, or within any reservation under the exclusive jurisdiction of the United States, unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission authorizing such operations: Provided, however, That, subject to section 310, if any such carrier or predecessor in interest was in bona fide operation as a common carrier by motor vehicle on June 1, 1935, *over the route or routes or within the territory for which application is made and has*

*so operated since that time*, or if engaged in furnishing seasonal service only, was in bona fide operation on June 1, 1935, * * *" (Emphasis supplied.)

49 U.S.C.A. § 308(a) "Any certificate issued under section 306 or 307 shall specify the *service to be rendered and the routes over which, the fixed termini, if any, between which, and the intermediate and off-route points, if any, at which, and in case of operations not over specified routes or between fixed termini, the territory within which, the motor carrier is authorized to operate;* and there shall, at the time of issuance and from time to time thereafter, be attached to the exercise of the privileges granted by the certificate such reasonable terms, conditions, and limitations as the public convenience and necessity may from time to time require, including terms, conditions, and limitations as to the extension of the route or routes of the carrier, and such terms and conditions as are necessary to carry out, with respect to the operations of the carrier, the requirements established by the Commission under section 304(a) (1) and (6): * * *" (Emphasis supplied.)

difference between these classes of opera-tors? The answer to that question depends somewhat upon a consideration of what has historically been the manner of operation of an irregular route carrier and regular route carriers prior to the passage of the Motor Carrier Act of 1935 and at the time the Commission made its classification of those carriers by general order in 1937.[3] The distinguishing characteristics between the irregular route carrier and one possess-ing regular route authority were not stated with meticulous nicety in the classification order of 1937, and apparently not until the present case was decided by the Interstate Commerce Commission did that body un-dertake to set out any extensive formula for making the distinction between the types. And then it disavowed, and we think very properly, the intention or even the pos-sibility of laying down any hard and fast inelastic yardstick which could be applied to all cases for the determination of what class a particular operation fell into. It did in its report in this case announce eight factors or criteria, some or all of which might in an individual case exist and have a relevant bearing on the deter-mination of the type of operation. It is clear from the Commission's order that there was no intention to assert that any one of those eight factors would necessarily be controlling. On the other hand, it is equally clear that the Commis-sion was undertaking to give such assist-ance as it could to the industry in announc-ing these factors in order that so many of them as might exist in any given case might be considered collectively in deter-mining the type of operation. It is un-necessary to restate these factors in detail. The salient portions thereof are set forth in the margin.[4] They do not constitute any new definition of an irregular route carrier,

[3] Classification of Motor Carriers of Property, 2 M.C.C. 703 (1937).

[4] "Predetermined plan.—Regular - route operation when once established is repe-titive in character and in its over-all as-pects is essentially operation according to a predetermined plan as contrasted with operation strictly on-call, as demanded and where demanded. This does not, however, mean that the plan in all its details must have been considered before the operation was begun. On the con-trary, as already indicated, it is frequent-ly the result of an evolutionary process. The significant thing is that from day to day and week to week the pattern of a regular-route operation is fixed to a de-gree inconsistent with a bona fide on-call anywhere-for-hire service."

"Character of traffic. Irregular-route call-or-demand carriers are all classified in some States as contract or private carriers, rather than as common carriers, because normally they cater to fewer shippers and respond only to calls for the movement of truckload lots or other substantial shipments. In contrast com-mon carriers operating according to a predetermined plan over regular routes between commercial centers or from dis-tribution points into consuming areas are the logical carriers of aggregated lots of miscellaneous less-than-truckload shipments, and regularly serve a great number of shippers. Thus the consist-ent day to day transportation in volume of aggregated lots of numerous less-than-truckload shipments is more a character-istic of regulate route, than of irregular route, carriers. This is true notwith-standing the fact that irregular-route carriers, who operate to and from a rec-ognized base area, frequently solicit and accept less-than-truckload shipments par-ticularly in making up return loads."

"Solicitation. The greater acceptabil-ity of less-than-truckload shipments to regular-route, than to irregular-route, carriers, just discussed, and the depend-ency of the former on a constant and con-tinuing volume of traffic reflects itself in solicitation by regular-route carriers which differs from that generally indulged by those who operate over irregular-routes. The solicitation of the latter is generally less intense and as a rule more selective. Such carriers do not try to reach the same number of shippers as do regular-route carriers. Thus employ-ment at the principal points served of one or more full-time solicitors whose du-ty it is regularly to call upon as many shippers as possible for the purpose of soliciting shipments both less-than-truck-load and truckload is more characteristic of regular-than irregular-route carriers."

"Terminals and call stations. Although the maintenance by an irregular-route carrier of a terminal or terminals at points other than its principal base is permissible under the act, J. Miller Co. Common Carrier Application, 42 M.C. C. 709, many such carriers maintain no terminals at points other than their re-spective bases and have no representa-tion and no telephone listing except at such bases. Some of them using the telephone number of some non-competi-

but merely enunciate the historically established differences in the type of operations long known and recognized by the industry and by Brady at the time it made original application for different types of certificates. The general criteria which the Commission has laid down as a basis for the classification of common carriers by type are in our judgment based upon abundant factual premises stated in the factors themselves. We conclude, therefore, that the classification was a reasonable one fully authorized by well recognized principles of law and the Act in question. Brady concedes the correctness of the facts found by the Commission and set forth in its report and order but contends that actually all of the factors considered by the Commission in reaching its conclusion that Brady had changed the type of its operation were factors originating out of an increase in the *quantity* of its operation, as distinguished from *type,* and hence the application of those factors is prohibited by the limiting provisions of 49 U.S.C.A. § 308(a), heretofore quoted in footnote 1 supra. With that contention we cannot agree. It is unnecessary in view of the careful and full consideration given to the question by the Commission and reported in its report and order, for us to amplify at length the difference in the type of operation which the Commission found Brady was now engaging in from the type of operation which it was performing prior to June 1, 1935, which was made the basis for its application for the irregular route certificate under the Grand-

---

tive carrier, gasoline service station, or similar establishment, arrange a telephone listing in their own name and so establish a so-called call station at which requests for service may be left. Regular-route carriers, on the other hand, if their operations are at all substantial, find the maintenance, at the principal points served, of terminals at which less-than-truckload shipments may be assembled, sorted, and loaded into line-haul equipment, a virtual necessity. Unquestionably the maintenance of terminals at a point other than the carrier's base coupled with the consistent movement of a substantial volume of less-than-truckload shipments, strongly suggests an operation of fixed regularity and according to plan rather than call-on-demand."

"Fixed routes. The adherence to fixed routes is, of course, the outstanding characteristic of regular-route carriers, but this does not mean that rigid and inflexible use of a particular route or routes is imperative to the status of a regular-route carrier. Recognizing this, the Congress in section 208 (b) of the act specifically provided that a common carrier 'may occasionally deviate from the route over which, and/or the fixed termini between which, it is authorized to operate * * * under such rules as the Commission may prescribe.' As already indicated, many regular-route services are the outgrowth of irregular-route operations which have gravitated in the channels of the greatest traffic. In the course of such evolution, a regular-route service is achieved, if its other elements are present, when the use of a particular route or routes becomes habitual and customary even though departures there-

from are freely made whenever to the carrier's advantage. This does not, however, mean that the habitual and frequent, even daily, use of a particular route between certain points by a carrier authorized to operate only over irregular routes is necessarily unlawful. Such considerations as the geographic situation, the length of the route, other available routes, the character of the traffic, the number of shippers served, and possibly others would affect the conclusion. Although they are definitely the exception rather than the rule, it is easy to conceive of a bona fide irregular-route carrier being engaged primarily in the daily transportation of the products of a particular plant which is so located as to require the repeated use of certain routes. Or such a carrier may be engaged in interplant operations for a single shipper such that economy of operation and expedition dictate the regular use of certain highways. In such instances the existence of a regular-route operation, as that term is used in certificates or permits issued under Part II of the act, is clearly negatived by other considerations which outweigh the repeated use of the same routes."

"Fixed termini. Fixed termini go with fixed (regular) routes and necessarily characterize every regular-route operation. That they may also in exceptional cases mark bona fide irregular-route operations is apparent from the immediately preceding discussion but, notwithstanding, it is clear that when the regular- or irregular-route status of a particular operation is in issue the fact that it is between fixed termini is particularly significant. This is especially true where,

father Clause and which was the premise for the issuance of that authority. We deem it adequate to observe that there is, as the Commission found, a clear distinction in type between the indiscriminate, co-incidental, non-scheduled, unperiodical, itinerant, ambulatory service of an irregular route carrier and the operation of a regular route certificate holder over a carefully specified route to only specifically authorized points on that route on schedules published and filed, with the obligation on the part of the carrier to give, and the responsibility on the part of the Commission to compel, the carrying out of that operation to such an extent as the convenience and necessity of the public justified. The decision reached by the Commission to the effect that Brady's systematic, periodic, scheduled, non-coincidental, premeditated, planned, regular service between St. Paul and Minneapolis on the one hand and Spencer and Fort Dodge on the other was a regular route operation, was justified by the conceded facts. To hold otherwise would, in effect, amount to an authorization by the holder of an irregular route certificate, authorizing service between St. Paul and Minneapolis on the one hand and all points in Iowa on the other, to establish regular route operation between St. Paul and Minneapolis and each and every point in Iowa without any finding that such service was necessary or convenient to the public or without any finding that such service had ever at any time been given be-

---

as here, the considered termini are widely separated, where a variety of routes are available between them, and where adherence to a particular route has not been without exception."

"Periodicity of service. As above stated, regular-route service is repetitive in character. It is necessarily marked by such periodic recurrence, as to become fixed in a pattern which is known to the public in contrast to on-call service which depends for its design wholly on the day to day needs of individual shippers. Regular-route service does not, however, depend upon the interval between offerings. Daily service is common but not necessarily the rule. Not infrequently regular-route 'grandfather' rights have been granted on proof of only two or three services weekly over claimed routes. The essential thing is a service of such fixed and definite periodicity that it becomes known to and is relied upon by shippers and consignees generally. Where, however, daily service is shown it is obvious that it is strong evidence of a regular-route operation. A continuing course of daily service for a long time between specific points over substantially the same routes is not likely to be achieved in a bona fide on-call operation without any predetermined plan."

"Schedules or their equivalent. The strict observance of a fixed published schedule of departures and arrivals, regardless of the available traffic, though the accepted practice of regular-route common carriers of passengers, is the ultimate in regular-route service by motor carriers of property, which is not achieved by more than a few. On the other hand, practices in the matter of tendering shipments and the preference of consignees for early morning deliveries tends to fix upon carriers, who regularly serve numerous shippers at merchandise distributing centers, a pattern of departures and arrivals which is characteristic of regular-route operators to a far greater degree than in the case of those who operate strictly on-call and over irregular routes. Like the respondent here, such regular-route carriers are engaged during the day in assembling and sorting less-than-truckload shipments preparatory to the loading of line-haul equipment. Normally all pick-ups are completed by late afternoon or early evening. As soon thereafter as practicable, line-haul equipment is loaded and dispatched, with a view to deliveries the next morning as soon as possible after the opening of business. Occasionally the early receipt of shipments for certain points aggregating more than a truckload permits the dispatching of a line-haul truck earlier than the usual hour. On other occasions the shipments received on a given day may be so slight that they are held over for the succeeding day to avoid operation of line-haul equipment too lightly loaded. Generally, however, regular-route operations of motor carriers of miscellaneous less-than-truckload freight are marked by a regularity in the arrival and departures of equipment, which is not characteristic of carriers operating only on-call and over irregular routes. Although more flexible, such customary arrival and departure times are the equivalent of the published schedules observed by passenger carriers generally and serve to emphasize the periodicity which identifies a regular-route service."

47 M.C.C. 23, 43-56 (1947).

tween two specific points. Such type of service is not that authorized by an irregular route certificate.

█ The contention that the Commission has restricted the service of this irregular route carrier for the purpose of improving the competitive position of regular route common carriers between the points involved is without merit. There is no indication in the order that such was the proximate ground for the Commission's cease and desist order.[5] It is clear that this order was made because of a finding, which we have heretofore concluded to be justified, that Brady was exceeding the authority of its irregular route certificate. If the result of the order may incidentally be to the advantage of other carriers operating between these points, then it is a result contemplated by the law and therefore not based upon any sinister or improper ground.

█ Is the order invalid for uncertainty? Brady contends that it is because it simply orders it to cease and desist from exceeding its authority without informing it with definiteness and certainty just what it can do under its irregular route certificate without becoming a regular route carrier and thereby exceeding the authority it holds. As heretofore noted, the Commission has gone to considerable lengths in advising Brady and other carriers of what factors may be relevant to a determination by the carrier of its rights under an irregular route certificate. It cannot, as heretofore observed, lay down any hard and fast inelastic rule by which every case can be automatically determined. The order is sufficiently definite and certain that it is not invalid for want thereof.

█ There remains the contention that the order is discriminatory because it imposes the classification of an irregular route carrier upon Brady with accompanying restrictions without any reasonable relation to the purpose of the Act. This contention has been answered by what has been said heretofore.

█ It may with propriety, however, be added that the Act of Congress contemplated that its administration should be primarily in the interest of the public convenience and necessity. Such being at least one of the purposes of the Act, it cannot reasonably be held that the limitation which the Commission stated in the irregular route certificate, to the effect that the holder thereof should not operate as a regular route operator, was not in the interest of public convenience and necessity. One of the underlying principles of regulation of utilities generally is that when the sovereignty assumes the power of regulation and requires the service and type of service which the regulatory authorities determine to be necessary and convenient in the public interest then some measure of protection against indiscriminate and uncontrolled competition must be provided.

The injunction will be denied and the complaint dismissed on the merits.

---

"Order

"At a Session of the Interstate Commerce Commission, Division 5, held at its office in Washington, D. C., on the 3rd day of February, A. D. 1947.

"No. MC–C–246

"Transportation Activities of Brady Transfer and Storage Company

"It appearing, That by an order dated February 4, 1941, the Commission, division 5, on its own motion, entered upon an investigation into and concerning the lawfulness of certain motor common carrier operations of Brady Transfer and Storage Company of Fort Dodge, Iowa;

"And it further appearing, That a full investigation of the matters and things involved in such proceeding has been made, and that the said division, on the date hereof, has made and filed a report herein containing its findings of fact and conclusions thereon, which report is hereby made a part hereof:

"It is ordered, That the respondent be, and it is hereby, notified and required to cease and desist, on or before April 9, 1947, from the motor carrier operations which it is found in said report now to be conducting without appropriate authority from this Commission, and to abstain from a resumption of such operations, until appropriate authority therefor has been obtained from this Commission, and that this proceeding be discontinued.

"By the Commission, division 5.

"W. P. Bartel,

"(Seal)                              Secretary."