201 F.2d 189
 CIVIL AERONAUTICS BOARD et al.
v.
AMERICAN AIR TRANSPORT, Inc., et al.
 No. 11115.
 United States Court of Appeals District of Columbia Circuit.
 Argued February 15, 1952.
 Question Certified to United States Supreme Court, June 12, 1952.
 Certificate Dismissed October 20, 1952.
 
 1
 See 344 U.S. 4, 73 S.Ct. 2.
 
 
 2
 Appeal Decided November 20, 1952.
 
 
 3
 Certificate to the Supreme Court of the United States
 
 Statement
 
 4
 The United States Court of Appeals for the District of Columbia Circuit certifies that the record in the above-entitled case discloses the following:
 
 
 5
 * American Air Transport, Inc., and Miami Airlines, Inc., brought a civil action in the United States District Court for the District of Columbia seeking an injunction which would restrain the Civil Aeronautics Board from putting into effect a Regulation adopted by the Board on March 2, 1951, to become effective April 6, 1951. The trial court made findings of fact and conclusions of law and entered summary judgment for the plaintiffs, permanently enjoining the Board from enforcing the Regulation, unless and until the plaintiffs were afforded "a full and fair evidentiary hearing with respect thereto." This appeal followed.
 
 II
 
 6
 The trial court made the following findings of fact, among others:
 
 
 7
 "(1) Plaintiffs are `Large Irregular Carriers' providing interstate air transportation for persons and property between Miami and other points, principally New York and Chicago. Defendants are the Civil Aeronautics Board and the members thereof.
 
 
 8
 "(2) The defendant Board adopted a regulation (in the form of a general exemption order) effective December 7, 1938, which permitted any carrier to engage in nonscheduled operations (defined as the operation of an air carrier which did not hold out to the public a regular service in air transportation). The regulation exempted all such operations from most of the economic (not safety) requirements of the Civil Aeronautics Act, 49 U.S.C.A. § 401 et seq. The exceptions stated in the regulation are not pertinent here.
 
 
 9
 "(3) Plaintiffs commenced operations in June 1946. Plaintiffs were first classified as `non-scheduled' and are currently classified as `Large Irregular Carriers'.
 
 
 10
 "(4) Plaintiffs' chief source of income is now and always has been from the transportation of persons and property. Since commencing business in 1946, plaintiffs and their stockholders, relying upon plaintiffs' authorizations to operate as air carriers under the regulations of the Board, purchased aircraft and made other substantial investments in a total amount of more than $125,000 in the business of `non-scheduled' air transportation. In the course of their operations, plaintiffs provide air service at low fares equivalent to railroad coach fares. During the year 1950, plaintiff American Air Transport operated 613 trips and plaintiff Miami Airlines operated 634. These trips were operated almost entirely between Miami on the one hand, and New York, Philadelphia and Chicago, on the other; and between San Juan, P. R., and New York. During the year 1951, plaintiffs expect to operate approximately the same number of trips, for the most part, between the same points. Plaintiffs do and will operate more than eight trips per month between several pairs of points. Plaintiffs' operations are performed in accordance with all of the safety regulations imposed by all regulatory authorities exercising jurisdiction over plaintiffs. Plaintiffs serve a useful public purpose.
 
 
 11
 * * * * * *
 
 
 12
 "(8) On May 20, 1949, the Board adopted another order, amending the exemption regulation to provide that no Large Irregular Carrier could engage in non-scheduled operations after June 20, 1949, unless by that date the carrier filed an `Application for Individual Exemption'. In the event of such filing, the carrier could continue to operate as a `Large Irregular Carrier.'
 
 
 13
 "(9) Plaintiffs seasonably filed such applications, formal notices for hearings were set, and hearings before an Examiner on the applications were completed, but no decision has yet been issued on either application.
 
 
 14
 "(10) While these applications were pending, the Board on March 2, 1951, ordered the adoption of the regulation complained against. This order (Economic Regulation 291.27, 16 F.R. 2216) is designated as an amendment to the general exemption regulation, and is entitled Operational Limitations on Exercise of Temporary Exemption by Large Irregular Carriers. It provides in pertinent part,
 
 
 15
 "`§ 291.27. Large Irregular Carriers: conditions on operating authority — extent of operations — (a) As an express condition on the operating authority granted by this Part and the letters of registration issued hereunder, no large irregular carrier shall engage in flights for compensation or hire, whether such flights are regarded by the carrier as common carriage or non-common carriage:
 
 
 16
 "(1) In excess of a total of three (3) flights in the same direction during any period of four successive calendar weeks between the following points:
 
 
 17
 "(i) New York and Miami
 
 
 18
 * * * * * *
 
 
 19
 "(xi) Chicago and Miami
 
 
 20
 "(2) In excess of a total of eight (8) flights in the same direction during any period of four successive calendar weeks between any two points other than those specified in subsection (1) above'.
 
 
 21
 "(11) The Board did not hold a formal evidentiary hearing before adopting this amendment. Instead, the Board mailed to large irregular carriers and published in the Federal Register a notice of the Board's intention to adopt the order here complained against. Any person could submit written data, views, or arguments pertaining thereto. The Board, in a later notice, announced its intention of hearing oral argument and did hear oral argument by all interested persons. Plaintiffs, by attorneys, either presented oral argument or assigned their allotted time to other persons. The Board did not require that any of the written data or oral argument be under oath. The Board did not permit any person to call witnesses, to cross-examine any person, or to offer competent evidence in explanation or rebuttal. The Board then ordered the adoption of the regulation complained against.
 
 
 22
 "(12) It is stipulated, and I find that the Board failed to comply with the requirements of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., pertaining to adjudication, but did comply with the requirements of that act pertaining to rule-making.
 
 
 23
 "(13) No previous regulation or order of the Board placed any numerical limit upon the number of flights which a large irregular carrier might make. Although a limitation of ten trips per month was proposed in May 1946, the Board did not, either at that time or subsequently, incorporate this provision in its regulations or other directives.
 
 
 24
 "(14) Plaintiffs have substantial investments, serious contractual commitments, and have developed valuable business and good will, all of which will be jeopardized by the Board's order limiting the number of trips which may be operated.
 
 
 25
 "(15) No question of public safety is involved in the instant case."
 
 
 26
 The trial court concluded as a matter of law: "The regulation complained of is void and of no effect as to the plaintiffs." In a memorandum opinion, 98 F.Supp. 660, the court expressed the view that the Regulation in dispute was void because it was adopted without such a hearing as is necessary under the Administrative Procedure Act and the Civil Aeronautics Act of 1938, as amended.
 
 III
 
 27
 Section 416 of the Civil Aeronautics Act of 1938[1] authorized the Board to establish classifications of air carriers according to the nature of the services performed, and provided that the Board might, upon certain findings, exempt any class of carriers from the requirements of any economic regulatory provision of the statute. Thereupon the Board issued a Regulation, which, as amended in December, 1938,[2] exempted from certain provisions of Title IV of the Act every air carrier which engaged solely in nonscheduled operations. This Regulation provided that an operation would be deemed to be nonscheduled "if the air carrier does not hold out to the public by advertisement or otherwise that it will operate one or more airplanes between any designated points regularly or with a reasonable degree of regularity".
 
 
 28
 In 1947, after an investigation and hearing, the Board revised its exemption rules and issued a Regulation which distinguished between carriers on the basis of the weight of aircraft employed and subjected the larger carriers to greater regulation.[3] It continued the exemption, with limitations, of all Irregular (called "nonscheduled" in the former Regulation) Carriers in substantially the former descriptive language, with the addition of a sentence reading: "No air carrier shall be deemed to be an Irregular Air Carrier unless the air transportation services offered and performed by it are of such infrequency as to preclude an implication of a uniform pattern or normal consistency of operation between, or within, such designated points." That Regulation also provided that no Irregular Air Carrier might engage in air transportation unless it had a Letter of Registration, issued by the Board upon pro forma application.
 
 
 29
 On December 10, 1948, the Board issued an "interpretation" of its Regulation in the form of ten illustrative examples of "irregular" air transportation.[4] It said that its purpose was to assist irregular air carriers to conduct their operations in conformity with the act and the Regulation.
 
 
 30
 In 1949 the Board further amended the Regulation,[5] after having circulated for comment a draft of the proposed amendment. It terminated the blanket exemption of Large Irregular Carriers and provided that such carriers must file applications for individual exemption, it being contemplated that such Letters would be issued to the Large Carriers after consideration by the Board of the circumstances pertaining to the individual applicants. Pending action by the Board upon their respective applications, if filed, they were permitted to operate under temporary exemption privileges.[6]
 
 IV
 
 31
 By May, 1950, the Board had before it 96 applications of Large Irregular Carriers for Letters of Registration. It issued a long (twenty-two printed pages) announcement of policy and program, called an Opinion, in respect to these applications. It can be summarized:
 
 
 32
 Prior to 1938 the industry was in a serious condition. The Civil Aeronautics Act of that year conferred upon the Board economic regulatory powers, the primary objective of which was the establishment of security of route, based upon a certificate of public convenience and necessity, as the keystone for sound and orderly development of the industry. The act also gave the Board power under certain conditions to exempt classes of carriers from various provisions of the act. From the beginning the Board recognized that a group of carriers furnishing a call-and-demand service, flying where, when and if requested, could not comply in any substantial measure with the requirements imposed upon certificated carriers operating upon assigned routes and upon schedules. There was a need for such irregular carriers. Accordingly the Board established its "nonscheduled" exemption Regulation. Growth of noncertificated air transportation after the war was tremendous. Despite frequent reiteration by the Board that its exemption regulations permitted only sporadic and limited operations, substantial numbers of these new carriers operated with increasing regularity between populous cities and over routes assigned to certificated carriers. The Board adopted various measures to cope with these practices. Generally speaking, the operations of Small Irregular Carriers had closely conformed to the "nonscheduled" operations for which the exemption Regulation was issued. A number of Large Irregular Carriers had been rendering truly irregular services. On the other hand, many Large Irregular Carriers had not so restricted their services and consistently had conducted operations far exceeding those authorized. They had been actually furnishing "route" service, as illustrated by a table of data, which included, for example, the fact that 21 of these carriers had flown 1,017 one-way flights between New York and Miami in the last half of 1949. It also appeared that the large Irregular Carriers which had concentrated on route services were the ones most frequently indulging in unfair and prohibited practices. The underlying factors which tempted these carriers to conduct route operations were economic. Those operations were in competition with certificated carriers. They were of a type not authorized by the exemption Regulation. The Board concluded that it would deny the applications of all Large Irregular Carriers which had consistently been conducting route services, but would grant exemptions to those which had been furnishing truly irregular services. As to the latter, however, the temptation to engage in regular route operations would continue, and therefore the Board deemed it necessary to impose further restrictions to insure that such carriers would perform the type of service which it was the Board's intention to authorize. A review of the flight reports of truly irregular carriers indicated that they had seldom exceeded certain numbers of flights between certain cities, and authorizations of that number of flights would permit sufficient flights to meet that need. Certain other conditions would be attached to exemption orders to be issued.
 
 
 33
 The Board announced that individual orders would be issued in connection with each pending application. Orders denying relief because of the conduct of route operations would afford those applicants opportunity to request hearing, and if hearing were requested effectiveness of the orders would be postponed until the procedure thus initiated was completed.
 
 V
 
 34
 Immediately after this Opinion had been promulgated, the Board on June 5, 1950, announced its intention to adopt the Regulation here complained of, quoted in major part in the findings of the District Court above set forth.[7] The rule-making procedure prescribed by the Administrative Procedure Act was thereafter followed.
 
 
 35
 On March 2, 1951, the Board adopted the proposed Regulation, to be effective April 6, 1951.[8] The Regulation would have been effective as to all Large Irregular Carriers operating under interim authority, whose applications for individual exemption had not until then been acted upon by the Board.
 
 VI
 
 36
 Upon the appeal to this court briefs were filed and oral argument had before a Division composed of the undersigned Circuit Judges.
 
 
 37
 It is not disputed that (1) the proposed Regulation includes for the first time as a regulation a numerical limit on flights; (2) the proposed Regulation would by its terms apply to the present appellants and, when so applied, would seriously injure and perhaps in large part destroy their business and property interests; (3) the proposed Regulation was adopted by approved rule-making procedure, but no proceeding of an adjudicatory nature in respect thereto was held by the Board; and (4) the District Court entered summary judgment upon undisputed findings which did not, however, include findings as to the established meaning, if any, of nonscheduled or irregular flight operations in the industry or as to established custom, if any, in respect thereto.
 
 
 38
 No majority of this court is able to agree upon a disposition of this case. The three judges are in agreement that, if a new regulation should legally be regarded as amending existing licenses, adjudicatory hearings for the benefit of existing licensees are necessary. The differences are as follows:
 
 
 39
 One judge would affirm the judgment of the District Court for these reasons: He thinks the new Regulation inserts into the appellees' preexisting licenses a crippling limitation of the number of irregular trips permitted thereunder, the licenses theretofore having been unrestricted in that respect, which will substantially injure and in large part destroy the existing property and business of the appellees. He thinks the insertion of such a restriction into the licenses originally unrestricted constitutes an amendment of the licenses which, under the Constitution and the statutes, is invalid without an adjudicatory proceeding.
 
 
 40
 One judge would reverse the judgment of the District Court, being of the opinion that, when licenses are issued under a regulation of a licensing agency, an amendment of the regulation which defines its terms in ways not shown to be arbitrary or capricious, duly adopted by a rule-making procedure and without an adjudicatory proceeding as to any affected licensee, is not to be regarded as amending licenses and is valid although it will have the effect of destroying substantial parts of the business of licensees.
 
 
 41
 One judge is of opinion (1) that the decisive question is whether the specific prescriptions of the new Regulation are or are not a proper, or reasonable, definition of the undefined terms ("regularly or with a reasonable degree of regularity") of the original licenses and (2) that that question is a question of fact which must be determined upon factual criteria, devised from studies of actual operations of regular carriers and of irregular carriers, similar to the criteria utilized by the three-judge court in Brady Transfer & Storage Co. v. United States[9] for like purposes under the Motor Carrier Act, and similar to the data which the Board says it used in formulating the Regulation here involved. Since the present record contains no evidence of that sort, this judge would remand the case to the trial court for the receipt of such evidence and a finding of basic facts and an ultimate finding therefrom as to whether the new Regulation does or does not in fact change the terms of the existing licenses.
 
 VII
 
 42
 This court is unanimously of opinion that the question presented is of far-reaching and fundamental importance in the field of administrative law. Therefore, this court respectfully requests the instructions of the Supreme Court upon the following question:
 
 Question
 
 43
 Where operating authority is granted by a regulatory agency and a private company operating thereunder acquires property and business in so doing, is a new regulation of the agency which in fact substantially injures or in large part destroys such property interests or business
 
 
 44
 (1) void as to that licensee unless an adjudicatory hearing is held, because it is on its face an amendment of his license; or
 
 
 45
 (2) valid if adopted by a rule-making procedure, provided the new regulation merely defines the terms of the old in ways not shown to be arbitrary or capricious; or
 
 
 46
 (3) does its validity as to that licensee depend upon a finding of fact that it does or does not in fact vary the terms of the license; or
 
 
 47
 (4) does its validity depend upon some other condition?
 
 
 48
 Henry W. Edgerton, Circuit Judge
 Wilbur K. Miller, Circuit Judge
 E. Barrett Prettyman, Circuit Judge
 
 
 49
 John H. Wanner, Associate Gen. Counsel, Civil Aeronautics Board, Washington, D. C., with whom Asst. Atty. Gen. H. G. Morison, and George Morris Fay, U. S. Atty., Washington, D. C., at the time the brief was filed, Emory T. Nunneley, Jr., Gen. Counsel, Civil Aeronautics Board, Ross O'Donoghue, Asst. U. S. Atty., and O. D. Ozment, Atty., Civil Aeronautics Board, Washington, D. C., were on the brief, for appellants. Charles M. Irelan, U. S. Atty. at the time of argument, Charles H. Weston, Chief, Appellate Section of the Antitrust Division, Department of Justice, and Joseph M. Howard, Asst. U. S. Atty., Washington, D. C., also entered appearances on behalf of appellants.
 
 
 50
 Albert F. Beitel, Washington, D. C., with whom George M. Morris, Washington, D. C., was on the brief, for appellees.
 
 
 51
 Before EDGERTON, WILBUR K. MILLER, and PRETTYMAN, Circuit Judges.
 
 
 52
 PER CURIAM.
 
 
 53
 We certified this case to the Supreme Court. On October 20, 1952, the Supreme Court dismissed the certificate. 344 U.S. 4, 73 S.Ct. 2. The circuit judge who formerly voted for affirmance and the circuit judge who formerly voted for reversal now concur with the circuit judge who formerly voted for remand. The case is remanded to the District Court for further proceedings in accordance with the opinion of that judge, 201 F.2d 189, 193, 194, as set forth in our certificate filed June 12, 1952.
 
 
 54
 Remanded.
 
 
 
 Notes:
 
 
 [1]
 52 Stat. 1004, as amended, 49 U.S.C.A. § 496
 
 
 [2]
 14 Code Fed.Regs. § 292.1 (Cum.Supp.)
 
 
 [3]
 14 Code Fed.Regs. § 292.1 (1947 Supp.)
 
 
 [4]
 13 Fed.Reg. 7769, 14 Code Fed.Regs. § 292.1 (1949 ed.)
 
 
 [5]
 14 Fed.Reg. 3546, 14 Code Fed.Regs. § 291 (1949 ed.) (1949 Supp.)
 
 
 [6]
 See Sec. 9(b) of the Administrative Procedure Act. 60 Stat. 212, 1946, 5 U.S.C.A. § 1008(b)
 
 
 [7]
 In addition to the provisions quoted by the District Court, the Regulation prohibited Large Irregular Carriers from engaging in flights:
 "(3) Between any two points in the same direction on the same day of two or more successive calendar weeks,
 "(4) In excess of a total of three (3) flights between any two points in the same direction during any period of two successive calendar weeks unless such period is followed by a break of at least one calendar week during which no flights are operated between such points,
 "(5) Which are so arranged as to result in the observance of breaks required by subparagraph (4) of this paragraph at regularly recurring intervals, or
 "(6) Which are so arranged as to result in any uniform pattern or normal consistency of operations between any two points.
 "(b) Notwithstanding the provisions of § 291.1(b), the term `point' as used in this section shall mean any city or any airport or place where aircraft may be landed or taken off, including the area within a 50-mile radius of such city, airport, or place."
 
 
 [8]
 16 Fed.Reg. 2217 (1951)
 
 
 [9]
 D.C.S.D.Iowa, 1948, 80 F.Supp. 110, affirmed, 1948, 335 U.S. 875, 69 S.Ct. 239, 93 L.Ed. 418