**TIDEWATER EXPRESS LINES, INC.,**
Plaintiff,

v.

**UNITED STATES** of America and Interstate Commerce Commission,
Defendants,

and

Hall's Motor Transit Company and Accelerated Transport-Pony Express, Inc.,
Intervening Defendants.

Civ. A. No. 17913.

United States District Court
D. Maryland.

Jan. 17, 1968.

James J. Doherty and Friedman & Goodman, Baltimore, Md., for plaintiff.

Stephen H. Sachs, U. S. Atty., Baltimore, Md., Donald F. Turner, Asst. Atty. Gen., John H. D. Wigger and Henri F. Rush, Jr., Washington, D. C., for defendants United States and Interstate Commerce Commission.

John E. Fullerton, Harrisburg, Pa., for intervening defendant, Hall's Motor Transit Co.

Christian V. Graf, Harrisburg, Pa., for intervening defendant, Accelerated Transport-Pony Express, Inc.

Before WINTER, Circuit Judge, and NORTHROP and HARVEY, District Judges.

HARVEY, District Judge:

Tidewater Express Lines, Inc. ("Tidewater") is asking the Court in this action (1) to set aside an order of the Interstate Commerce Commission ("the Commission"), denying its application for conversion of its irregular route authority to a regular route authority, or (2) in the alternative to remand the case to the Commission for re-opening of the record and the receipt of additional evidence. Pursuant to applicable provisions of Title 28, United States Code, a three-judge Court was convened to hear the case.[1] By leave of Court, Hall's Motor Transit Company ("Hall's") and Accelerated Transport-Pony Express, Inc. ("Pony Express"), both of which protested before the Commission the granting of Tidewater's application, have been permitted to intervene as parties defendant.[2]

1. 28 U.S.C.A. §§ 1336, 1398, 2284 and 2321–2325.

2. Hall's and Pony Express, as competitors of Tidewater, both cla'm that the

Tidewater is a common carrier of property by motor vehicle operating in Maryland and Pennsylvania with both regular and irregular route authority. Tidewater filed with the Commission on February 26, 1965 an application seeking to have converted to a regular route authority that portion of its Certificate of Public Convenience and Necessity authorizing the operation of an irregular route between Hagerstown, Maryland, and points within fifty miles of Washington, D. C. Such application was filed pursuant to the Commission's Special Rules of Procedure Governing Conversion of Irregular Route to Regular Route Motor Carrier Operations ("the Special Rules"), 49 CFR §§ 2a.1–2a.6, effective from May 1, 1964 until March 1, 1965. In support of its application, Tidewater submitted a four-page verified statement of its Secretary and General Manager.[3]

■ On February 16, 1966, a Commission Examiner, without holding a hearing, issued his report and order recommending that the application be denied. After discussing the policy behind the Special Rules and pertinent criteria as set forth in the Commission's decision in Transportation Activities, Brady Transfer and Storage Co., 47 M.C.C. 23 (1947), such report said the following:

"In applying the *Brady* criteria and the foregoing policy declaration to the record in this proceeding, it is recognized that these precedents envision a standard of proof somewhat less stringent than is normally required in order to show that a proposed common carrier operation is required by the public convenience and necessity. At the same time, however, it is essential that in addition to basic details concerning its terminal facilities and the like, an applicant seeking conversion of an irregular-route operation adduce something more than vague, general, or indefinite assertions that its existing activities have evolved into a regular-route service. Such statements rather should be substantiated by traffic exhibits covering a representative period of time which documents establish such facts as the tonnage handled, and the specific points between which service was provided. The record here is lacking in even a scintilla of proof along this line. Although, as to the years subsequent to 1962, this failure obviously is attributable to the carrier's labor problems, it would seem that if in the years immediately prior to the aforesaid cessation of operations applicant was in fact transporting substantial traffic on a scheduled basis, the presentation of appropriate documentary evidence would be a relatively simple matter. A satisfactory showing of this sort is all the more vital in circumstances such as those here present because of the circuity entailed by applicant's presently certificated operations between Hagerstown and many points in Pennsylvania which fact casts doubt upon applicant's ability to provide such service in a lawful manner. The Examiner concludes, therefore, that the evidence presented fails to warrant a grant of the authority requested under the aforementioned special rules, and that the application should be denied." [4]

granting of the application would significantly disrupt the competitive situation in the area in which all three carriers operate.

3. Other than the verified statement, the only other attachments were a list of Tidewater's equipment, a balance sheet, a map and Tidewater's original Certificate which had been issued by the Commission on June 23, 1947.

4. Referring to the protests filed by the competing carriers, Pony Express and Hall's, the Examiner in his report further found that joinder of Tidewater's irregular and regular routes between Hagerstown, Maryland, and points in Pennsylvania would entail substantial circuity. Evidence as to an application's effect on the competitive balance in an area is a proper factor for consideration by the Commission in refusing to issue a certificate to a carrier seeking entry into such area. Ratner v. United States, 162 F.Supp. 518 (S.D.Ill., 1957), affirmed per curiam, 356 U.S. 368, 78 S.Ct. 913, 2 L.Ed.2d 842 (1958).

Tidewater thereupon filed exceptions to this report and order. Such exceptions did not ask that the record be re-opened for the filing of any additional material, but rather requested that consideration be given to evidence in an earlier proceeding brought by Tidewater before the Commission, in which the application had been decided adversely to Tidewater on June 27, 1962. On June 21, 1966, the Operating Rights Review Board Number 3 of the Commission upheld the Examiner and denied the application. In its decision and order, the Board noted that none of the evidence presented in the 1962 proceeding had been incorporated in evidence in the current proceeding and stated that it would be inappropriate to consider in the pending matter evidence submitted in such other case.

On June 28, 1966, plaintiff filed a petition for re-consideration and reopening of the record. In such petition, Tidewater asked that the Commission re-open the record and receive in evidence an abstract showing shipments accepted by Tidewater for the period from May 29 through June 23, 1961. By order dated October 31, 1966, Division 1 of the Commission, acting as an Appellate Division, denied the petition in the following language:

> "*It is ordered,* That the said petition be, and it is hereby, denied, for the reasons that the findings and conclusions of Operating Rights Review Board Number 3 are in accordance with the evidence and the applicable law, that it does not appear that acceptance of the proposed amendment would result in any change in said findings and conclusions, and that no sufficient or proper cause appears at this time for amending the application, or for reopening the proceeding for reconsideration and for the purpose of receiving additional evidence."

## I

In this action which next ensued, Tidewater claims first that its original application with attached exhibits was sufficient under the Special Rules for the Commission to grant the requested conversion, and that in any event it was misled by the application form and the Special Rules to such an extent that it believed that it was not necessary to furnish a statistical abstract. Tidewater contends that the Commission's Special Rules represent a substantial relaxation of the rigid standards that must generally be met to secure a certificate of public convenience and necessity and require no more than a generalized statement for the granting of such an application. In support of its position, Tidewater in particular refers to the following language contained in § 2a.5 of the Special Rules, 49 CFR § 2a.5:

> "Consistent with the foregoing, and in the light of the National Transportation Policy declared in the Act, where the facts make it clear that applications filed under the rules in this part represent a bona fide effort to aid the Commission in resolving the larger problem occasioned by the controversial distinction between regular- and irregular-route service, it will be the policy of the Commission to hold the applicant carriers only to such burden of proof as is consistent with a realistic approach to the objective here sought to be achieved."

The terms "regular" and "irregular routes" are nowhere defined in Part II of the Interstate Commerce Act, although there is a reference to these terms in connection with the definition of "common carrier by motor vehicle" contained in § 303(a)(14), 49 U.S.C.A. However, § 304(b) empowers the Commission to establish such just and reasonable classifications of brokers or groups of common carriers by motor vehicle as the special nature of the services performed require and to establish "such just and reasonable rules, regulations and requirements, consistent with the provisions of this chapter, to be observed by the carriers or brokers so classified or grouped, as the Commission deems necessary or desirable in the public interest". It was not until the *Brady* decision in 1947,

supra, that the Commission undertook to enunciate guide lines for making the distinction between regular and irregular route operations, and various factors or criteria were stated as pertinent to such distinction. As summarized by the Commission, the eight practices which it found to be characteristic of regular route operations were as follows (47 M.C.C. at page 28):

"* * * (1) operation according to a predetermined plan or outline, (2) the movement in significant amounts of particular types of traffic, (3) the vigorous solicitation of this particular type of traffic and the holding out of particular types of service, (4) the maintenance at significant points of terminals devoted to, and designed for, the expeditious handling of certain traffic and the conduct of certain types of operation, (5) the habitual use of certain (fixed) routes, (6) operation between fixed termini, (7) a marked or constant periodicity in the service given, and (8) the observance of definite or published schedules or their equivalent."

In Brady Transfer and Storage Co. v. United States, 80 F.Supp. 110 (S.D.Iowa 1948), affirmed per curiam 335 U.S. 875, 69 S.Ct. 239, 93 L.Ed. 418 (1948), the court held that the classification by the Commission of common carriers into irregular route and regular route operators was fully authorized by the Act and upheld as reasonable the eight general criteria laid down by the Commission as a basis for classification of common carriers.[5] Some years later in Motor Common Carriers of Property-Routes & Services, 88 M.C.C. 415 (1961), the Commission was asked to overrule the Brady decision and eliminate the distinction between regular and irregular route carriers. In reaffirming the Brady criteria, the Commission observed that the principles of that case had become accepted guideposts for the motor carrier industry and that there was no justification for

abolishing or modifying such principles at that time.

Thereafter, because of a backlog of applications, the Commission adopted the Special Rules to provide during the limited period from May 1, 1964 through March 1, 1965 for a simplified procedure whereby applications might be filed and expeditiously processed for converting irregular route operations which had evolved "through the natural processes of evolution" into regular route service. Midwest Motor Express, Inc., 96 M.C.C. 402 (1964). A careful reading of the Special Rules, however, indicates that such Rules did not alter the requirements of the Brady decision, but in fact expressly adopted the eight criteria established therein. § 2a.1, in describing the scope of the Special Rules, provides that such Rules govern the filing of applications for certificates which would authorize operations over described regular routes "in lieu of certain corresponding authorized transportation of property over irregular routes between terminals, which transportation has heretofore evolved into regular route operations within the criteria enunciated in Transportation Activities, Brady Transfer & Storage Co., 47 M.C.C. 23." § 2a.3 contains instructions for filing such application and includes the following statement:

"In addition, the application shall be accompanied by verified statements of facts *setting forth in detail all the evidence relied upon* to justify the proposed conversion to regular-route operations within the criteria established in Transportation Activities, Brady Transfer & Storage Co., supra." (Emphasis added)

§ 2a.5 of the Special Rules incorporates within its terms a quotation from the Brady case stating that the Act permits conversion of an irregular route whenever in the normal development and growth of such service "the movement of traffic between particular points becomes *so constant in point of time* and

5. To the same effect is the more recent decision of Alabama Highway Express,

Inc. v. United States, 241 F.Supp. 290, 295 (N.D.Ala., 1965).

*of such volume* as to suggest a public need for an added regular route service between such points, * * * " (Emphasis added).

▮ In urging that the Special Rules do not require or contemplate the filing of traffic exhibits as a part of the application, Tidewater misconstrues both the language and the history of such Rules and the *Brady* criteria. Clearly, detailed fact statements are still necessary. Although the Special Rules do not require that an applicant bear the substantial burden normally imposed on a common carrier seeking a certificate, an applicant must still furnish proof to satisfy the specific standards adopted by the Commission to show that an irregular route has evolved into a regular one. The conclusory statements of Tidewater's General Manager to the general effect that its irregular route authority has been operated on an increasingly integrated basis with its regular route authority are insufficient to satisfy the burden which the applicant must meet under the Special Rules adopted by the Commission.

Although it is true as claimed by Tidewater that on its face the application itself was not entirely clear, we find from the record here that Tidewater was not in fact misled by the imprecise wording used by the Commission in its Form BMC 78 entitled "Application for Motor Carrier Certificate or Permit." Paragraph II of such application states, in part, that if authority "is sought to *continue* an operation, attach an abstract from applicant's records to show actual shipments on and after the date the operation was instituted" (Emphasis added). Tidewater argues that since it sought "to change" an operation and so indicated on the application, no abstract was necessary under these instructions to show actual shipments. However, the General Manager's verified statement indicates

that Tidewater did not attach a statistical abstract not because it misunderstood the application but because the Company's operations were suspended in March, 1962 as a result of a strike called by the International Brotherhood of Teamsters and such suspension of business continued until July, 1964. The following statement is included on page 3 of such exhibit:

> "This strike situation is called to the Commission's attention to explain the absence of any records of service to the points mentioned above during the period in question."

▮ Congress has delegated to the Commission the authority to determine whether a certificate of public convenience and necessity is to be granted or denied, and in proceedings such as these the Commission has a wide discretion. Chesapeake Motor Lines, Inc. v. United States, 176 F.Supp. 98 (D.Md., 1959); Interstate Commerce Commission v. Parker, 326 U.S. 60, 65, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945). A reviewing court cannot substitute its own view as to what should be done, but is limited to ascertaining whether the Commission's judgment upon matters committed to its determination has support in the record and the applicable law. United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 536, 66 S.Ct. 687, 90 L.Ed. 821 (1946). We conclude that the Commission's determination that Tidewater had not furnished sufficient evidence to warrant a grant of the authority requested is amply supported by the record here and the applicable law and regulations.

## II

▮ Tidewater next contends that the Commission abused its authority in declining to re-open the case and receive in evidence statistical data submitted with Tidewater's petition for reconsideration.[6] Rehearings and re-openings be-

6. In its petition for reconsideration, Tidewater does not contest the Examiner's finding that the joinder of portions of its irregular and regular routes would entail substantial circuity. To cure such defect, Tidewater offers to submit to a Commission-imposed restriction against operations between Hagerstown, Maryland, and Chambersburg, Pennsylvania, and points intermediate thereto.

fore administrative bodies are addressed to their sound discretion and only a showing of the grossest abuse of discretion justifies the interference of the court. United States v. Pierce Auto Freight Lines, Inc., supra; Monumental Motor Tours, Inc. v. United States, 110 F.Supp. 929, 932 (D.Md., 1953). In Yourga v. United States, 191 F.Supp. 373 (W.D.Pa., 1961), the court stated the test for determining whether proceedings should be re-opened because of newly discovered or after discovered evidence to be as follows, at page 377:

"In order to grant the petition for reconsideration on the ground of newly discovered evidence, it must appear that the evidence was discovered since the hearing; the facts must be such that reasonable diligence on the part of the party seeking rehearing may be inferred; the evidence is material and not merely cumulative or impeaching, and the evidence will probably produce a different result."

The Commission's order of October 31, 1966 stated that "no sufficient or proper cause appears at this time for amending the application, or for re-opening the proceeding for reconsideration and for the purpose of receiving additional evidence". Attached to Tidewater's petition for reconsideration was a statistical abstract containing a summary of shipments. Relying on Carolina Scenic Coach Lines v. United States, 59 F.Supp. 336 (W.D. N.C., 1945), affirmed per curiam, 326 U.S. 680, 66 S.Ct. 37, 90 L.Ed. 398 (1945), the defendants argue that a reasonable interpretation of the order denying the petition for re-hearing indicates that the Commission considered the proffered abstract and concluded that the facts contained therein would not in any way change the Examiner's result. In that case the court declined to order the Commission to grant a re-hearing and in the course of its opinion said the following at page 337:

"There is nothing before us upon which we would be justified in saying that in denying the rehearing the Commission did not give full consideration to all these matters; and, for aught that appears, its denial of the rehearing may well have been based upon the view that, assuming the matters urged in the petition to be true, they could not affect its decision."

In the present case, however, it is not necessary to decide whether the Commission considered and found insufficient the proffered abstract or whether it disregarded the abstract and decided that no good reason had been shown for re-opening the case. This Court has carefully reviewed the statistical data proffered, and we conclude from the facts disclosed by this exhibit that nothing would be gained nor would a different result be reached by the Commission if the case were remanded for receiving in evidence such exhibit.

■ The proffered abstract shows the origin or destination of shipments to or from Hagerstown, Md., and the weight in pounds and date of each such shipment during a period of about a month from May 29 to June 23, 1961. The application was filed on February 26, 1965, and the petition for reconsideration on July 28, 1966. Statistics as to shipments in 1961 can hardly form the basis for a conversion to a regular route in 1965 or later. It is indeed unfortunate that Tidewater's operations were disrupted by a strike between 1962 and 1964; however, Tidewater's burden of furnishing sufficient proof in support of the sought conversion is in no way lessened because of the fortuitous circumstance that a strike occurred.

■ Even after the strike was concluded in July, 1964, Tidewater did not resume less than truckload service to Hagerstown or points in Pennsylvania and according to counsel had not resumed such service by the date of the hearing before this Court. With no such service since 1962, clearly Tidewater has not proved even with the submission of the

proffered abstract the increasing and constant volume of past operations required by § 2a.5 of the Special Rules. In his affidavit filed with the original application, Tidewater's General Manager stated that the Company "intends to resume these services conducted by it in the past as soon as conditions will permit". When the statistics as to shipments for some four weeks in 1961 are considered in the light of such a vague statement of future intentions, it is apparent that Tidewater has not sustained its burden of proving that by 1965 its irregular route operations had evolved into regular route service to such an extent that its certificate should be amended by the Commission.

This Court's decision in Jarman v. United States, 219 F.Supp. 108 (D.Md., 1963) is not to the contrary. In that case, a trucker of frozen produce applied for authority to continue his operations under the "grandfather clause" contained in Section 7(c) of the Transportation Act of 1958. This Court ordered a rehearing before the Commission so that it might determine whether the applicant was entitled to have area-wide authority established as opposed to authority differing according to different places of origin. In ordering a remand, this Court expressly approved the test stated in the Yourga case, supra, but found that evidence of shifts in traffic since the Commission's hearing might produce a different result and therefore should be considered by the Commission. In the present case, there is no newly discovered or after discovered evidence which might produce a different result. Indeed, the proffered evidence relating to shipments in 1961 was available when the original application was filed and cannot now be supplemented with more recent data inasmuch as the operations in question were never resumed after the strike ended in 1964.

For the reasons stated, the Commission's orders are affirmed. Counsel will prepare and submit an appropriate order dismissing the complaint.